UNITED STATES of America, Appellee,

v.

**Stanley FRIEDMAN, Michael Lazar, Lester Shafran, and Marvin Kaplan, Defendants–Appellants.**

**Nos. 107 to 110, Dockets 87–1134, 87–1137 to 87–1139.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1987.

Decided June 14, 1988.

As Amended July 18, 1988.

---

536

See also, 635 F.Supp. 782, 636 F.Supp. 462, 638 F.Supp. 816.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Victoria B. Eiger, Dershowitz & Eiger, New York City, of counsel), for defendant-appellant Stanley Friedman.

Marvin E. Frankel, New York City (Debora K. Grobman, Jonathan L. Polkes, Lisa E. Davis, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellant Michael Lazar.

Larry J. Silverman, New York City (Shira A. Scheindlin, Cynthia R. Finn, Scott Francis, Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, New York City, of counsel), for defendant-appellant Lester Shafran.

Gerald B. Lefcourt, New York City (Walter P. Loughlin, Newark, New Jersey, Joshua L. Dratel, Erica Horwitz, New York City, of counsel), for defendant-appellant Marvin Kaplan.

Stuart E. Abrams, Asst. U.S. Atty. for S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., William J. Schwartz, Bruce A. Green, Asst. U.S. Attys. for S.D.N.Y., New York City, of counsel), for appellee.

Arthur Eisenberg, New York City, for amicus curiae New York Civil Liberties Union.

Before CARDAMONE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

The New York City Parking Violations Bureau ("PVB"), an agency of the City's Department of Transportation ("DOT"), collects parking fines. But the jury in this

case found that the PVB was also used to collect bribes and kickbacks and had become a cesspool of corruption. It found that appellants Stanley Friedman, Michael Lazar, Lester Shafran and Marvin Kaplan had participated in the operation of the PVB as a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), (d) (1982 & Supp. IV 1986). The jury convicted each appellant of racketeering, conspiracy to engage in racketeering, and mail fraud. In addition, Kaplan was convicted of having perjured himself in testimony before the Securities and Exchange Commission about bribes relating to this case.

Appellants raise a host of issues. Shafran and Kaplan contend that the government's evidence was insufficient to prove certain of the charges against them. Lazar contends that the evidence demonstrated multiple conspiracies rather than the single conspiracy charged in the indictment. Lazar and Shafran contend that the district court erred in denying their requests for severance. Kaplan contends that his convictions should be reversed because some of the testimony against him was "purchased" by a grant of immunity amounting to "an invitation to perjury"; that his RICO conviction should be reversed because his alleged bribery of two public officials constituted a single criminal transaction under New York law and therefore was only one predicate act under RICO; and that even if he was properly found to have committed two predicate acts, these acts did not constitute a "pattern of racketeering activity." Friedman contends that his attorney's alleged conflicts of interest denied him the effective assistance of counsel; that he was prejudiced by erroneous evidentiary rulings; and that he was further prejudiced by the district court's publicly-reported belief that he had told a "highly improbable story" on the witness stand. Finally, all appellants contend that the indictment should have been dismissed because the government repeatedly violated Fed.R.Crim.P. 6(e) by generating extensive publicity through leaking information concerning the grand jury proceedings.

We vacate the mail fraud convictions in light of the government's concession that *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), requires us to do so. In addition, we reserve decision on Kaplan's RICO convictions pending in banc review of issues in an unrelated case concerning the meaning of a "pattern of racketeering activity." The remaining convictions, however, are affirmed. Given the length of the trial, the complexity of the issues, and the vigor with which it was prosecuted and defended, Judge Knapp conducted a remarkably fair and error-free trial.

## BACKGROUND

### A. *The Indictment and the Proceedings Below*

Appellants were tried on a fourth superseding indictment, Indictment SSSS 86 Cr. 259 (WK), filed in the Southern District of New York on September 10, 1986. The indictment contained ten counts. Count One charged that appellants, along with unindicted "co-racketeers" Donald Manes and Geoffrey Lindenauer, and defendant Marvin Bergman (who was severed at the close of the government's case), had conducted and participated in the affairs of an enterprise—the PVB—through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Count Two charged the same individuals with having conspired to conduct and participate in the affairs of the PVB through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). In support of Counts One and Two, the indictment alleged that the general object of the racketeering activity was "to transform the PVB from a public agency devoted to the performance of public services ... into a vehicle for the corrupt profit of county leaders, public officials, private businesses and private businessmen."

The RICO counts charged appellants with twenty-two predicate acts of racketeering. Friedman was charged in four racketeering acts (Nos. Nine, Ten, Twenty–One and Twenty–Two) with having bribed Manes and Lindenauer on behalf of two

PVB contractors, Citisource and Datacom, and in one racketeering act (No. Twenty) with having committed mail fraud in violation of 18 U.S.C. § 1341 (1982) by facilitating a bribery scheme on behalf of another contractor, the Bernard Joint Venture. Lazar was charged in three racketeering acts (Nos. One, Two and Three) with having bribed Manes and Lindenauer on behalf of two PVB contractors, Datacom and Miller & Rothman, and in one racketeering act (No. Four) with bribing Shafran by providing him with the opportunity to invest in a parcel of commercial real estate, the Candler Building, on behalf of a PVB contractor, Datacom. Three other racketeering acts (Nos. Six, Seven and Eight), which charged Lazar with having committed bribery to increase the value of the Candler Building, were dismissed before trial. Shafran was charged in ten racketeering acts (No. Five, and Nos. Eleven through Nineteen) with having accepted, in violation of New York law, the alleged real-estate bribe from Lazar and a series of other bribes from two PVB contractors, Systematic Recovery Services and the Bernard Joint Venture. Finally, Kaplan was charged in two racketeering acts (Nos. Nine and Ten) with having bribed Manes and Lindenauer on behalf of one of his own firms, Citisource.

Count Seven charged Kaplan with perjury in his testimony before the SEC, in violation of 18 U.S.C. § 1621 (1982). The remainder of the indictment was devoted to bribery-related charges of mail fraud involving various permutations of defendants and contractors and essentially tracking the predicate acts detailed above.

At the request of the defendants, Judge Knapp conducted the trial in New Haven, Connecticut with jurors from the Hartford area. *See* Fed.R.Crim.P. 21. The trial lasted just over nine weeks. The jury convicted Friedman, Lazar, Shafran and Kaplan on Counts One and Two, the racketeering and racketeering conspiracy charges. Friedman and Kaplan were found guilty of all of the racketeering acts with which they were charged. Lazar was found guilty of the three racketeering acts (Nos. One, Two and Three) that charged him with having

bribed Lindenauer; he was found not guilty, however, of the racketeering act (No. Four) involving his alleged bribery of Shafran by means of an investment in the Candler Building. The jury found Shafran guilty of six (Nos. Twelve and Fourteen, and Nos. Sixteen through Nineteen) of the ten racketeering acts with which he was charged; he was found not guilty of having taken the alleged Candler Building bribe from Lazar (No. Five) and of three (Nos. Eleven, Thirteen and Fifteen) of the eight racketeering acts that charged him with accepting bribes from Systematic Recovery Services. In addition, the jury disposed of the mail fraud counts in a fashion consistent with its findings as to the RICO predicate acts, returning verdicts of guilty on each count save for Count Five, which charged both Lazar and Shafran with mail fraud in connection with the alleged Candler Building bribe. Finally, the jury convicted Kaplan of perjury.

Friedman received a twelve-year sentence of imprisonment, to be followed by five years' probation, and was required under 18 U.S.C. § 1963 (1982) to forfeit 167,500 shares of stock in Citisource, a firm that the jury found had enlisted Friedman to pay bribes. Lazar received three years' imprisonment and a fine of $200,000, and was required to forfeit $45,000. Kaplan received four years' imprisonment and a fine of $250,000, and, like Friedman, was required to forfeit his 90,000 shares of Citisource. And Shafran, whom the district court considered "the least culpable" of the defendants, was sentenced to six months' imprisonment to be followed by five years' probation. Finally, each defendant was required to pay a special assessment as required by 18 U.S.C. § 3013 (Supp. IV 1986).

### B. *The Government's Proof*

In light of the jury's verdict, we view the evidence in the light most favorable to the government.

#### 1. *The Politicians and the PVB*

A central figure in the pervasive corruption of the PVB was Donald Manes, a ma-

jor figure in New York City politics until his suicide in the spring of 1986. During the 1960's, Manes served as a New York City Councilman from Queens. He was elected Queens Borough President in 1971 and became Chairman of the Queens Democratic Committee in 1974. Manes's accession to the borough presidency and party chairmanship, posts which he held until 1986, made him one of the most powerful of New York City's politicians. As Borough President, Manes sat on the New York City Board of Estimate, the body that negotiates and approves all City contracts. As leader of the Queens Democratic Party, he controlled the distribution of substantial patronage in City government.

While serving as a City Councilman, Manes established friendships with defendants Michael Lazar and Stanley Friedman. Lazar, like Manes, was a Councilman from Queens. Friedman served as counsel to the Majority Leader of the City Council. During this period, Manes also met Geoffrey Lindenauer, a key witness for the government in this case and a remarkably decadent and corrupt person. Lindenauer falsely claimed to hold a Doctor of Philosophy and operated a sham psychotherapy institute with the help of his mother. The institute was unprofitable financially, but Lindenauer used it as a way of having sex with his patients. The institute failed in 1974, but only after Manes had loaned Lindenauer $25,000 to purchase the portion of the institute owned by Lindenauer's mother.

During the next two years, Manes unsuccessfully attempted to find work for Lindenauer. In 1976, Manes introduced Lindenauer to Stanley Friedman. Friedman, then Deputy Mayor, secured for Lindenauer a patronage job in the City's Addiction Services Agency, a position from which he was fired approximately one year later. Manes then secured another patronage job for Lindenauer, this time an assistant directorship in the PVB. Manes warned Lindenauer that if he lost the PVB job, there would not be a third. Thus chastened, Lindenauer became an upwardly mobile City bureaucrat, gaining promotion to the second-highest position in the PVB, Deputy Director.

Meanwhile, Michael Lazar was rising in political prominence. In 1971, he was appointed Chairman of the City's Taxi and Limousine Commission. In 1974, he became Administrator of the DOT, the parent agency of the PVB. After leaving City government in 1976, Lazar remained active in Democratic Party politics, becoming a member of the Finance Council of the Democratic National Committee. Taking full advantage of his political ties, Lazar prospered as an attorney, lobbyist and developer. His political protégé was defendant Lester Shafran, a former associate in Manes's law office and a former Assistant District Attorney in Queens. When Lazar served as Chairman of the Taxi and Limousine Commission, he appointed Shafran to be the Commission's Assistant General Counsel. When Lazar later became Administrator of the DOT, he appointed Shafran to serve as the DOT's Inspector General, thereby making Shafran responsible for investigating corruption in the DOT. After Lazar left the DOT in 1976, Lazar's friend Manes helped Shafran obtain an appointment as Deputy Commissioner of the DOT and Director of the PVB.

The PVB retains private contractors to perform a variety of tasks. For example, the PVB has contracted with private firms to perform data-processing services, to redesign its computer system and to perform keypunching for the entry of parking-violation data into its data-processing system. The PVB also awards contracts to private collection agencies for the collection of parking tickets. Thus, if the PVB is unable to collect a parking summons issued to a vehicle registered in New York, it will assign the task of collecting the summons to a "first placement agency" working on a commission basis. If the first placement agency fails to collect the summons, the PVB reassigns the summons to a "second placement agency." Second placement agencies receive higher commissions than first placement agencies. The PVB also awards contracts for the collection of summonses issued to rental cars and to cars registered outside New York. The PVB's

collections serve as an important source of revenue for New York City.

## 2. *Datacom Systems Corporation*

In 1975, a data-processing firm, Datacom Systems Corporation, contracted with the PVB to collect summonses issued to vehicles registered outside New York. Datacom developed a successful program for towing such vehicles found in New York City. In 1978, Datacom retained Lazar to assist in its dealings with City agencies and with other agencies throughout the nation. Lazar initially received a monthly retainer of $500 from Datacom.

Datacom received very favorable treatment from the PVB during the late 1970's and early 1980's. In 1979 Datacom signed a new contract with the PVB for first-placement collection work. Shafran, a close friend of Datacom's vice president, Neal Anderson, was instrumental in ensuring Datacom's success. In 1979, however, Lindenauer began to complain to both his superior, Shafran, and his patron, Manes, that the PVB was failing properly to monitor Datacom. Shafran repeatedly dismissed Lindenauer's protests. Lindenauer nevertheless lodged complaints with Anderson and Datacom's president, Joseph Delario, and caused the delay of collection assignments to Datacom. Delario became upset at Lindenauer's behavior, and, knowing that Lindenauer was a Queens political appointee, Delario and Anderson sought help from their Queens political consultant, Lazar. In turn, Lazar sought out Manes, who suggested that bribery was the solution to Datacom's difficulties with Lindenauer.

Accordingly, Manes told Lindenauer in late 1979 that Datacom was unhappy with Lindenauer, but that if Lindenauer would assist Datacom in obtaining a new contract, the company would give Lazar $500 every month to pay to Lindenauer. Manes proposed that Lindenauer repay Lindenauer's debt to Manes with some of this money. Manes also told Lindenauer not to let Lazar know that some of the money would go to Manes. The first bribe was paid one week later, when Lindenauer visited Lazar's home in Queens. After telling Lindenauer that he should cooperate with Datacom and ensure that the firm received business from the PVB, Lazar handed Lindenauer an envelope containing $500. Lazar delivered payments to Lindenauer from late 1979 through most of 1982. The bribes were supposed to be paid monthly, but Lazar often failed to pay on time. Lindenauer's treatment of Datacom varied accordingly. Between 1979 and 1982, Manes persuaded Lazar to increase the payments to as much as $2,000. At trial, Lindenauer estimated that he had received approximately $30,000 in bribes from Lazar, and that he had turned over $17,000 to Manes.

Although Datacom's president, Delario, knew of Lazar's payments to Lindenauer, Delario never gave Lazar money expressly for this purpose. Instead, Delario rewarded Lazar through generous increases in his retainer. Lazar's monthly fee reached the sum of $10,000 by mid–1982. By that time, Lazar had received a total of $300,000 in fees from Datacom. However, Lazar complained to Datacom about having to pay Lindenauer from his own pocket and about having to pay taxes on money given to Lindenauer. Tensions between Lazar and Datacom mounted, finally resulting in an angry confrontation between Delario and Lazar in which Delario terminated Datacom's relationship with Lazar.

## 3. *Miller & Rothman*

In the middle of 1981, while he was still working for Datacom, Lazar told Lindenauer that he hoped to form his own collection firm. Lazar proposed that if Lindenauer helped the new agency obtain a second-placement contract with the PVB, Lazar would make Lindenauer and Manes silent partners in the new firm. Lindenauer and Manes agreed, and Lazar contacted Barry Miller, a lawyer with whom he was acquainted, to suggest that he and Miller form the collection firm. Lazar told Miller that the new firm could obtain business from the PVB through Lazar's "friends," Lindenauer and Shafran. Miller agreed to become half-owner of the new agency. Lazar gave a five-percent share of the new

agency to Allen Rothman, an associate in Lazar's law firm who was to perform legal work for the new agency. Lazar kept the remaining forty-five percent of the new firm for himself, Lindenauer and Manes. At the same time, however, Lazar concealed his participation in the firm, fearing that revelation of this interest would attract public scrutiny. He thus made certain that his name did not appear in the company's records, and he styled the firm Miller & Rothman. Miller & Rothman's certificate of incorporation did not list Lazar as a shareholder.

Miller & Rothman submitted a proposal for a second-placement contract in late 1981. In his effort to help the firm obtain a contract, Lindenauer met with Miller, Rothman and Lazar at Lazar's beach house. Lindenauer thereafter both assisted the firm in preparing its application and lobbied the PVB committee in charge of awarding contracts. These efforts failed, however, when Miller revealed to the PVB committee that Lazar was a director of Miller & Rothman. James Rose, Comptroller of the PVB and chairman of the selection committee, informed Lindenauer that Lazar's existing relationships with both Miller & Rothman and Datacom constituted a conflict of interest. Lindenauer and Lazar responded by having Miller inform the PVB by letter that Lazar would no longer serve as a director of Miller & Rothman. The effect of this letter was blunted, however, when Miller, in response to a direct question from Rose, revealed that Lazar was a partner in Miller & Rothman. Having thus learned of Lazar's ownership interest, Rose sought to defeat Miller & Rothman's application before his committee.

Shafran thereupon intervened. He lobbied each member of Rose's committee in an effort to secure votes for Miller & Rothman. When Rose confronted Shafran with the facts underlying Lazar's conflict of interest, Shafran lied, telling Rose that Lazar had no relationship whatsoever with Miller & Rothman. Shafran nevertheless withdrew his support for Miller & Rothman when DOT Commissioner Anthony Ameruso told him that Shafran's close affiliation with Lazar appeared improper, especially in light of Shafran's enthusiasm for Miller & Rothman. Lindenauer, realizing the potential risks inherent in his continued vocal support for Miller & Rothman, informed Rose that he would not object to the committee's rejection of Miller & Rothman's application. Subsequently, Rose's committee rejected the application, much to the relief of Lindenauer, who told Manes that "these guys [presumably Lazar, Shafran and Miller] were so dumb they would have gotten us all in a lot of trouble."

### 4. *Systematic Recovery Service*

Lazar was involved with yet another PVB contractor, Systematic Recovery Service ("SRS"), a debt-collection agency. The owner and president of SRS, Bernard Sandow, first met Lazar in 1976 shortly after Lazar had left his position as Administrator of the DOT. Claiming that he still controlled the PVB, Lazar promised that he could obtain a PVB first-placement contract for SRS, a promise fulfilled in early 1977. Although Lazar and Sandow agreed that Lazar would receive a commission on SRS's profits, SRS earned no profits. In 1980, Lazar and Sandow entered into another agreement under which Sandow agreed to pay Lazar a monthly retainer in exchange for Lazar's assistance in obtaining PVB work for SRS. Sandow, however, failed to make timely payments and ultimately cancelled the agreement in November 1980. Annoyed at Sandow's failure to meet his obligations, Lazar asked Lindenauer to terminate the PVB's contract with SRS. Lindenauer balked at this suggestion, pointing out that "[y]ou just can't do something like that for no reason." Soon thereafter, Shafran also asked Lindenauer to cancel SRS's contract. Lindenauer again refused. Lindenauer nevertheless instructed James Rose to draft a memo rationalizing a reduction in assignments to SRS.

Lindenauer's attitude toward SRS soon changed. In the middle of 1980, Sandow hired his close friend Sheldon Chevlowe to execute judgments on behalf of SRS. Chevlowe, also a close friend of Manes,

subsequently suggested to Lindenauer that Sandow could serve as a source of bribe payments. Indeed, Sandow in late 1980 agreed to pay Chevlowe two and one-half percent of SRS's collection commissions in exchange for Chevlowe's assistance in gaining favor with the PVB. Sandow began making these payments in cash to Chevlowe in early 1981. Chevlowe, in turn, gave the cash to Lindenauer, who divided it evenly between himself and Manes. After he began receiving bribes from Chevlowe, Lindenauer directed Rose to increase SRS's assignments and to give SRS whatever types of summons assignments Sandow might request. SRS's first-placement contract was subsequently renewed. Some months later, Lindenauer told Chevlowe that he had begun to feel "very comfortable" with Sandow, but complained that collecting money from Sandow through Chevlowe had become logistically "awkward." According to Lindenauer, "it was getting more and more difficult to arrange all these crazy meetings." After gaining Manes's approval, Lindenauer began to receive bribes directly from Sandow in early 1982.

Sandow's payments to Lindenauer increased as SRS, due to Lindenauer's efforts, received more assignments and commissions from the PVB. Indeed, when Lazar stopped paying bribes on behalf of Datacom in mid–1982, Lindenauer blocked the renewal of Datacom's rental-car contract and ensured that the contract was given to SRS. Lindenauer subsequently received two and one-half percent of SRS's commissions under its new contract. By December 1985, Lindenauer and Manes had split $250,000 to $300,000 in cash payments from Sandow. In addition, Lindenauer had received other benefits from Sandow, including meals, video equipment, airline tickets and an encyclopedia.

Shortly after SRS had gained favor with Lindenauer, the firm encountered some resistance from Shafran, who was actively supporting Datacom. In particular, Shafran wanted to renew Datacom's rental-car contract, and he became furious at Lindenauer when the contract was given to SRS. Fearing Shafran's continued opposition to SRS, Lindenauer urged Sandow to find a way to appease Shafran, such as taking Shafran to lunch more frequently. Moreover, in the spring of 1983, Lindenauer complained to Manes that "I couldn't handle the fights that were going on between Lester and myself in regard to Sandow," and stated that he had even given Sandow permission to give Shafran "money from the bribes that [Sandow] was giving Donald [Manes] and myself." Heeding Lindenauer's advice, Sandow began treating Shafran to expensive lunches, often spending more than $70 for two. Aware that his receipt of these meals was improper, Shafran joked with Sandow about City regulations that prohibited a private vendor from spending more than $5 per meal for a City employee. Shafran went to lunch with Sandow approximately six dozen times between 1983 and 1985. Sandow also took Shafran and his wife to expensive dinners and concerts. Moreover, Shafran sometimes solicited benefits from Sandow. For example, in December 1985 he asked Sandow to purchase theater tickets to two shows for the Shafran family. Sandow spent $830 on the tickets although he himself did not attend the performances. On another occasion, Sandow allowed Shafran to charge dinner to Sandow's account at a Manhattan restaurant. Overall, between 1983 and 1985, Shafran accepted approximately $3500 in meals and entertainment from Sandow. Well-fed and amused, Shafran became less resistant to SRS.

Lindenauer nevertheless believed that meals and theater tickets might not suffice to guarantee Shafran's support for SRS. After consulting with Manes, Lindenauer told Sandow in late 1982 or early 1983 that "it would be a good idea if [Sandow] could try and get Lester [Shafran] to accept some cash." Thus, shortly after Sandow began regularly taking Shafran to lunch, Sandow offered Shafran cash, stating that "I was starting to become very successful and would like to share my success with [you]." At first, Shafran refused Sandow's offer, telling Sandow that "the better way you can share your success is just continue to do a good job." By 1984, however,

Shafran began accepting money from Sandow. For example, during the summers of 1984 and 1985, Sandow gave Shafran approximately $3200 to enable Shafran to visit and to entertain his wife, who was working in rural Pennsylvania at a summer camp attended by the Shafrans' daughters. Moreover, in the early fall of 1985, at Shafran's request, Sandow gave Shafran $1200 to pay for the videotaping of Shafran's daughter's bas mitzvah. The videotaping cost only $300, and Shafran pocketed the remaining $900. In addition, Shafran asked Sandow for money in order to pay for the remodeling of Shafran's kitchen. Sandow responded in December 1985 by handing Shafran $3000 under a table in a Manhattan restaurant.

After each payment to Shafran, Sandow would report to Lindenauer. Pleased with Shafran's eagerness to accept cash, Lindenauer told Sandow that Shafran spoke well of Sandow and that Datacom's influence over Shafran had waned. Indeed, in the fall of 1985, Shafran had gone so far as to ask Datacom not to bid against SRS for a rental-car contract to be awarded in 1986. Late in 1985, however, Shafran announced that he was planning to leave the PVB. Fearing that Shafran's departure might damage SRS's chances of securing renewal of the rental-car contract, Lindenauer told Sandow to bribe Shafran to stay at the PVB. Sandow accordingly offered Shafran $5,000 per month to remain at the PVB for one more year. Shafran declined, however, stating that there was no need for him to stay at the PVB because he could control the awarding of the contract from the outside. Shafran then asked Sandow: "If the contract is renewed, can I still get the money?" Sandow, although annoyed at Shafran's insistence on leaving the PVB, agreed to the request.

The FBI arrested Sandow on December 20, 1985. After government agents informed him that he was under investigation in both New York and Chicago, Sandow agreed to cooperate with the government. In particular, Sandow taped a meeting between himself and Shafran at which the two men discussed reports in the press that Sandow was under investigation in Chicago. At this meeting, held on December 31, 1985, Shafran was nervous about speaking with Sandow. In fact, Shafran mouthed the question "Are you wired?", to which Sandow shook his head in response. At another point in the meeting, Shafran wrote Sandow a note asking the very same question, and Sandow orally responded "No, no." Shafran remained unconvinced. When Sandow cryptically reminded Shafran that Sandow had promised to remodel Shafran's kitchen, Shafran abruptly changed the subject and observed that SRS had achieved its success "on the merits."

Shafran nevertheless expressed concern that evidence might exist documenting his receipt of meals and entertainment from Sandow. Shafran expressed concern about the $830 in theater tickets Sandow had recently given him, and Sandow stated that he could see no problem with the tickets. Concerned about recently signing Sandow's name to a restaurant bill, Shafran also wrote a note asking Sandow if there was any problem with the restaurant chits. At the end of the meeting, Shafran walked Sandow to the elevator. Still afraid of being taped, he nervously told Sandow, "You're going to make me crazy about keeping your hands in your pocket there. What have you got?" Sandow pulled a receipt from his pocket to reassure Shafran. Shafran then apologized for his suspicions. Before Sandow entered the elevator, Shafran told Sandow to "work it out," and urged Sandow to "[k]eep it out of New York." Sandow replied, "You know it. If there's any way I can."

5. *Citisource, Inc.*

Defendant Marvin Kaplan owned and operated a group of computer-service companies along with his older brother Albert, and their partners Marvin Kushnick and Morton Karper. The partners were known informally as "The Four K's," and their companies as the "Kaplan Group." The Kaplan Group firms included Computer Facilities Resource, Inc., Retail Data Processing, Data Conversion Corporation, Technical Maintenance and Services, and Data Consulting and Leasing. The Kaplan

Group firms provided data-processing services for municipalities throughout the northeast, including Boston, Washington, D.C., Elizabeth, New Jersey, and New York City. These services usually involved the keypunching of parking and other types of tickets.

In about 1979, Data Conversion Corporation received a contract to perform the microfilming of parking tickets and the manual entry of information from parking tickets into the PVB computer. In the early 1980's, the PVB began to explore the possibility of using hand-held computers to issue parking tickets. At the end of each day, information stored in these hand-held computers would be transferred electronically to the PVB's data-processing system. The need for keypunching would be eliminated. The Four K's understandably feared that Data Conversion's keypunching work for the PVB would be jeopardized if they did not develop the new computer system themselves. Accordingly, in 1981 the Four K's hired Robert Richards, an investment partner of the Kaplan brothers, to oversee the development of a hand-held computer. The Four K's also hired Stanley Friedman as a lobbyist to assist them in obtaining a contract with the PVB for the development of the computer.

After leaving his position as Deputy Mayor, Friedman practiced law and remained politically active. He served as Chairman of the Bronx Democratic Committee and as a member of the Democratic National Committee. Like Manes, he was thus one of New York City's most influential politicians. As a lobbyist for the Kaplan Group, Friedman used his influence to organize a meeting attended by himself, Kaplan, Richards, Lindenauer and Lawrence Yermack, the Deputy Commissioner of the DOT. At this meeting, Kaplan and Richards attempted to persuade Lindenauer, Yermack and other City officials to award the Kaplan Group a contract to conduct a pilot project to develop the hand-held computer. Although the Kaplan Group sought a "sole-source" contract, Yermack stated that any contract for the computer would be awarded through competitive bidding.

Soon after their meeting with Yermack, Kaplan told Lindenauer that he would handsomely reward Lindenauer and Manes if they would assist the Kaplan Group in obtaining the contract. Specifically, Kaplan offered Lindenauer and Manes $500,000 each in stock of the company that Kaplan was creating to develop the hand-held computer. Lindenauer and Manes agreed to Kaplan's proposal. Manes insisted, however, that Friedman be enlisted to hold the stock. Lindenauer accordingly asked Friedman to hold the stock in three blocks, one each for Manes, Lindenauer and Friedman. Friedman agreed.

Municipal agencies in New York City solicit competitive bids by issuing "requests for proposal" ("RFPs"), which set forth specifications for contracts to be awarded through competitive bidding. Kaplan directed Richards to assist Lindenauer, whom Kaplan described as a friend of the Kaplan Group, in drafting an RFP for the hand-held computer. When they met, Lindenauer told Richards that he wanted to assure that the Kaplan Group would receive the contract for the hand-held computer and asked for information that would enable Lindenauer to draft an RFP favorable to the Kaplan Group.

Richards and Lindenauer then drafted an RFP that required the company obtaining the contract to guarantee the continuation of manual data entry. The Kaplan Group, whose Data Conversion Corporation was already engaged in manual data entry, was ideally suited to render such a guarantee. The RFP also provided that the PVB would make payments that were based on the number of summonses processed by the new system. The firm that won the contract would thus not be paid for developing the computer until the new system actually began to operate. Confident in the ability of the Kaplan Group to raise capital, Lindenauer and Richards believed that providing for payments based only on summons volume would favor the Group. In January 1983, the Kaplan Group formed Citisource, Inc. to respond to the RFP. Marvin Kaplan and Robert Richards were named chairman and president, respectively, of the new

firm. Although Citisource's response to the RFP acknowledged Friedman's position as "special counsel" to the firm, at Kaplan's direction it omitted Friedman from its list of Citisource's prospective major shareholders.

Ten firms submitted responses to the RFP. Of these firms, Lindenauer's technical staff selected Motorola as the most qualified. Lindenauer nevertheless sought to convince the PVB's selection committee to recommend Citisource over Motorola and the other bidders. Lindenauer delivered to Richards the proposals submitted by Citisource's rivals and asked Richards to prepare comparative evaluations of the proposals. Richards responded by drafting a batch of handwritten evaluations favoring Citisource. After arranging to have the evaluations typed at the PVB, Lindenauer instructed PVB staff members to issue the evaluations to the selection committee and to take credit for their preparation. The PVB employees, threatened with dismissal by Lindenauer, obeyed his orders.

During the selection process, Lindenauer sought assurances from Kaplan, Friedman and Richards that the Kaplan Group would keep its side of the bargain. Kaplan told Lindenauer that the Citisource stock would soon be issued and that Friedman would receive 57,500 shares to hold for Manes and 57,500 shares to hold for Lindenauer. When Lindenauer visited Friedman, Lindenauer emphasized his desire that Friedman receive the stock before the selection committee's vote. Friedman stated that he understood, and wrote "57,500" on a piece of paper. After showing the paper to Lindenauer, Friedman burned it in an ashtray. Lindenauer also told Richards that Friedman would hold 50,000 shares of Citisource stock each for Manes and for Lindenauer. Subsequently, when Lindenauer asked Richards if "everything [was] all right," Richards responded that "Donald gets 50 and you get 50."

Citisource issued its stock in April 1983. Friedman subsequently received three certificates for 50,000 shares each and one certificate for 7,500 shares.[1] In late May, Friedman assured Lindenauer that he had received the stock by showing Lindenauer a letter confirming Friedman's receipt of three 50,000-share blocks of stock. Lindenauer subsequently informed Manes that Friedman had received the stock and told Manes that the PVB selection committee would make its decision in a matter of days. Lindenauer also reminded Manes that Manes "had to get it [the proposed Citisource contract] through the Board of Estimate." Manes responded, "I know. You don't have to tell me. All I want to know from you is when it's going to appear before the Board of Estimate and give me the calendar number." When the PVB selection committee met on June 7, 1983, however, the committee expressed concern that Citisource had yet to develop an adequate printing device for its hand-held computer. Lindenauer falsely told the committee that such a printer had been developed and that he had seen it. The committee then voted unanimously to award the contract to Citisource.

In the early months of 1984, the Kaplan Group decided to offer Citisource stock to the public in order to raise capital for the development of the hand-held computer. The company's only asset, however, was the prospect of obtaining a PVB contract, which had yet to be approved by the Board of Estimate. Friedman accordingly exerted his influence to expedite consideration of Citisource's prospective contract. While concealing his ownership of Citisource stock, Friedman lobbied Deputy Mayor Stanley Brezenoff, stating that Citisource was his client and urging that a decision on the PVB contract be made because the delay was causing Friedman "terrible embarrassment" and Citisource "a lot of financial difficulties." The contract was placed on the Board of Estimate's calendar in June 1984 and was approved at the end of that month. Shortly thereafter, Citisource signed a City contract valued at approximately $22 million.

---

1. In a subsequent reissuance of stock, Friedman received an additional 10,000 shares, thus bringing the total in his possession to 167,500 shares, the number he has been ordered to surrender.

Citisource then filed a draft prospectus concerning the public offer of stock with the Securities and Exchange Commission. Although the company had thus far successfully concealed Friedman's ownership interest and directorship from the City, the draft prospectus accurately disclosed that Friedman was both Citisource's largest shareholder and a director of the company. After newspaper reports of the prospectus were published, Michael Zapantis, counsel to the PVB, wrote to Citisource and demanded to know when Friedman had first become a shareholder and a director. Citisource's response, drafted by Friedman and Kaplan and signed by Richards, falsely stated that Friedman had not become a shareholder until September 28, 1983, more than three months after the PVB selection committee's vote and four months after Friedman had in fact received his shares.

Citisource went public in the fall of 1984, and by February 1985 its stock traded at $15 per share. Each 50,000–share block of stock was thus worth $750,000. The company, however, failed to meet production deadlines. In January 1986, after the government's investigation of Citisource became public, the City canceled Citisource's contract. At approximately the same time, Kaplan told Richards to remain silent about Friedman's role in holding stock for Manes and Lindenauer. In February 1986, during testimony before the SEC, Kaplan was asked why Friedman was Citisource's largest shareholder. Kaplan responded by giving a rambling answer ultimately stating that he believed the stock was given to Friedman solely because he would be an asset in introducing, advising and helping Citisource.

### 6. *The Bernard Joint Venture*

Having fired Michael Lazar, *see supra* Part B(2), Joseph Delario believed in late 1982 that his company, Datacom, needed to hire a new consultant to handle its difficulties with Lindenauer and the PVB. Delario's friend Marvin Kaplan suggested that Datacom retain Stanley Friedman for approximately $150,000 to $200,000. Delario agreed, but felt that he could not pay such a fee openly. He thus proposed that Fried-

man's retainer be taken from payments made by Kaplan's Data Conversion Corporation for services that Datacom regularly performed for Data Conversion outside New York. Instead of paying Datacom, Data Conversion would make payments to Friedman, and no payments to Friedman would appear in Datacom's records. Kaplan liked the idea, and his firm issued Friedman checks amounting to more than $200,000 during the following two years.

As already noted, however, Datacom did not succeed in obtaining renewal of the rental-car contract that Lindenauer and Manes were determined to deliver to SRS. Friedman explained to Delario that it was "politically impossible" for Datacom to obtain both of the contracts that it sought. Not a good loser, Delario then sought a way to separate Lindenauer from the PVB. Delario thus met with Friedman and Kaplan and complained about both Lindenauer's enmity for Datacom and his propensity for corruption. Friedman and Kaplan initially stated that they did not think Lindenauer was corrupt, and Friedman explained that Lindenauer would be shielded by Manes in any event. Delario later suggested that Manes could help Lindenauer find another job. Apparently hoping to convey to Delario the impossibility of this suggestion, Friedman scrawled "They are partners" on a scrap of paper that he then burned.

Friedman would soon earn his Datacom retainer, however. Delario had long urged the PVB to institute a towing program for vehicles registered in New York, just as the agency had done for out-of-state vehicles. While the sheer number of in-state vehicles had always posed a mammoth obstacle to such a program, the prospect of the PVB's hand-held computer provided a possible solution to this problem. There were nevertheless differing opinions as to who should get the contract. On the one hand, Lindenauer hoped to award the contract jointly to SRS and to Sennet & Krumholtz ("S & K"), another collection agency from which he and Manes regularly took cash. On the other hand, Shafran wanted to see the contract given to Datacom, in the

hope Datacom would then give him a job. Lindenauer and Shafran ultimately resolved this difference of opinion by agreeing that SRS, S & K and Datacom should strike a deal to cooperate in running the in-state towing program.

Bernard Sennet and Samson Jochnowitz, the principals of S & K, and Sandow, of SRS, objected strongly to this proposal. Although Sennet and Jochnowitz expressed a willingness to pay a portion of their expected commissions from the towing program to Lindenauer and Manes, they were unwilling to work with Datacom. Lindenauer discussed this stalemate with Manes and proposed that Friedman, who was then representing Datacom, be enlisted to make peace among S & K, SRS and Datacom. Manes agreed, and soon thereafter Lindenauer went to Friedman's home to discuss the in-state towing program. After explaining how S & K and SRS were blocking the towing program with their objections to Datacom, Lindenauer told Friedman that "I think that you can serve as the peacemaker in this whole thing." In response, Friedman immediately suggested that he receive one-third of the money that was to be diverted from SRS and S & K to Lindenauer and Manes. When Manes later learned of this proposal, he became angry at Lindenauer. As a consequence, Lindenauer met again with Friedman and proposed that Friedman receive a separate commission from Datacom and share it with Lindenauer and Manes. Although he had not been hired by Datacom to work on the in-state towing program, Friedman seized upon Lindenauer's suggestion and announced that he would charge Datacom a commission of one percent on the proceeds it received from the towing program.

After several months of negotiation conducted with Friedman's guidance, the three firms agreed upon a structure for the towing program. SRS and S & K would form a joint venture, the Bernard Joint Venture ("BJV") (named after Bernard Sandow and Bernard Sennet), to administer the towing program. The BJV would retain Datacom as a towing subcontractor for a percentage of the commissions received by the BJV. Delario agreed to pay one percent of the total collections generated by the BJV to Friedman. Friedman insisted, however, that his fee be laundered through Kaplan, and Kaplan agreed to pass Friedman's money through Desu Consulting and Leasing, a firm in the Kaplan Group. On January 31, 1985, Delario and Kaplan signed a sham agreement under which Datacom agreed to pay Desu one percent of the BJV's commissions, ostensibly for data-processing services but in truth to give to Friedman. Friedman was expected to earn $100,000 to $500,000 during the BJV's first year of operation.

Meanwhile, Lester Shafran saw opportunity in the BJV. While the BJV was being formed—and thus before Shafran approved it as the PVB's director—Shafran initially solicited from Bernard Sennet of S & K a partnership interest in Sennet's firm to be awarded after Shafran left the PVB. Subsequently, Shafran agreed to accept in lieu of the partnership a $100,000 consulting contract from the BJV to begin after Shafran left the PVB. The contract would be conditioned upon the BJV's success and would be paid from its revenues. As Sennet explained to Sandow, "That's going to be the way we're going to take care of Lester." Shafran, in turn, took care of the joint venture and authorized the in-state towing program in February 1985. He nevertheless continued to seek assurances that Sennet would honor their agreement for the future consulting contract. Indeed, at one point, when the BJV's principals refused Shafran's request for a $50,000 advance payment, Shafran obtained Friedman's aid, and Friedman later told Lindenauer that he would ensure that the BJV stood by its $100,000 commitment to Shafran.

### 7. *The Final Days*

In the middle of 1985, Marvin Kaplan suggested to Joseph Delario that the Kaplan Group and Datacom bid jointly for a new PVB contract for the provision of data-processing and facilities-management services. According to Kaplan's proposal, the joint bid would be submitted in Datacom's name, and a Kaplan Group firm

would be retained as a subcontractor. Delario, however, feared opposition from Lindenauer and asked Friedman whether Lindenauer could be controlled. Friedman responded by writing a dollar sign on a piece of paper, which he then showed to Delario and burned in an ashtray. Friedman accordingly negotiated an agreement under which Lindenauer, Friedman and Manes would divide equally among themselves approximately ten percent of Datacom's earnings under the new contract. Because Lindenauer did not trust Datacom, however, he subsequently insisted on receiving a $50,000 advance. Friedman stated that the most he could arrange was $35,000 but promised to discuss the matter with Delario.

A short time later, on September 23, 1985, Friedman, Delario and Lindenauer met over dinner. At one point, Lindenauer stated that he was "very pleased that we're now working together, and the three of us are partners in this venture." Friedman, who had not yet advised Delario of the details of the payment to Lindenauer, looked surprised and began to chew nervously on his cigar. Friedman later related this incident to Manes. On the next day Manes chastised Lindenauer, stating, "[Y]ou've got a big mouth.... Where the hell do you get off opening your mouth like that? Stanley [Friedman] was so disturbed, ... [h]e wanted to walk away from everything." Lindenauer later apologized to Friedman and promised that "it won't ever happen again."

Immediately after the dinner, Friedman assured Lindenauer that Delario would keep his word. Friedman subsequently met with Delario and Kaplan in late October 1985 and informed them that Lindenauer and Manes wanted ten percent of Datacom's earnings under the new contract. Despite some misgivings, Delario and Kaplan agreed to this arrangement. When Friedman next brought up the issue of the $35,000 advance to Lindenauer, Delario expressed vehement opposition. Kaplan, however, offered to advance the money through a Kaplan Group firm. Delario then relented, and Kaplan and Friedman agreed to disguise the payment by issuing a false legal bill. Soon thereafter, Lindenauer received, through Manes, a $15,000 payment from Friedman on behalf of Delario and Kaplan. Lindenauer often asked Datacom to draft memoranda that could be used to persuade the DOT that Datacom should be awarded the contract. As Robert Richards had done on behalf of Citisource, Datacom personnel drafted the memoranda to appear as Lindenauer's work product. Finally, Delario and Kaplan began to execute a scheme by which Datacom reimbursed Kaplan for Lindenauer's advance. This scheme, however, was soon halted by news of an FBI investigation.

Kaplan and Delario met in January 1986 to discuss the implications of the FBI investigation. Delario expressed fear that the advance payments to Lindenauer might come to light and asked whether Friedman had ever actually made the payment. Kaplan responded that Friedman had refused even to talk about the matter. Delario and Kaplan also discussed the agreement through which Desu Consulting and Leasing laundered Delario's payments to Friedman. In particular, Kaplan suggested canceling the agreement and backdating the cancellation to December 2, 1985, a date preceding revelation of the government's investigation. Delario agreed to this suggestion and promptly prepared a backdated cancellation. Delario also sent Friedman a retainer agreement under which Datacom agreed to pay him $7,000 per month. This agreement gave the false appearance that Friedman was only then beginning to represent Datacom in connection with the instate towing program. In addition, Kaplan sent Datacom false invoices for the repayment of Datacom's portion of the money Kaplan had advanced to Lindenauer.

Donald Manes responded to the investigation by unsuccessfully attempting suicide in January 1986. Friedman, Delario and Kaplan met shortly after this event and agreed upon a story to explain the cancellation of the Desu agreement. Friedman emphasized to Delario that the latter should, if asked about the joint venture negotiations, falsely tell federal authorities

that he had approached Friedman. Manes killed himself in mid-March.

## DISCUSSION

A. *Sufficiency of the Evidence and Related Issues*

Putting aside contentions regarding the jury's finding of a RICO conspiracy, *see infra* Part B, only Shafran and Kaplan contest the sufficiency of the evidence on specific counts or predicate acts. Shafran argues that the evidence was insufficient to support the jury's finding that he was guilty of the bribery predicate acts underlying his RICO convictions. He also asserts that the jury was improperly instructed on the bribery charges against him. In turn, Kaplan argues that there was insufficient evidence to support his perjury conviction or the predicate finding of bribery. These contentions are all without merit.

### 1. *Shafran: Bribery Racketeering Acts*

Shafran contends that his RICO convictions, which were predicated upon acts of bribery, must be reversed for two reasons. First, he argues that the evidence was insufficient to prove an intent to receive bribes. Second, he argues that the district court committed error by failing to instruct the jury that the benefits he had received from Sandow might be viewed as gifts, rather than as bribes or gratuities.

(a) *Sufficiency.* Under New York law, a public servant is guilty of receiving a bribe "when he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that his vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.10 (McKinney Supp.1988). As the language of the statute suggests, acceptance of a bribe "requires no act beyond the agreement or understanding." *People v. Charles*, 61 N.Y.2d 321, 326, 462 N.E.2d 118, 120, 473 N.Y.S.2d 941, 943 (1984). So long as a public servant has "colorable"

authority over the subject of the agreement or understanding, he or she may be found guilty of receiving a bribe even if the public servant does not or cannot perform the contemplated action. *See id.;* N.Y. Penal Law § 200.15 supplementary practice commentary (McKinney Supp.1988). Moreover, "[i]t is immaterial that the result sought by the bribe giver is a lawful and proper one, or indeed that the outcome sought would have happened in the absence of a bribe." N.Y. Penal Law § 200.10 (McKinney 1975) practice commentary; *accord United States v. Brennan*, 629 F.Supp. 283, 294 (E.D.N.Y.), *aff'd*, 798 F.2d 581 (2d Cir.1986).

Shafran was found guilty of six predicate acts of receiving bribes: five relating to his receipt of various benefits from Bernard Sandow, and one involving the BJV consulting contract. In contesting the sufficiency of the evidence supporting these verdicts,[2] Shafran emphasizes the lack of evidence of an explicit statement that he was accepting the Sandow benefits and the BJV consulting contract in exchange for the exercise of his official discretion. In Shafran's view, the worst inference a reasonable jury could draw is that the Sandow benefits and the consulting contract were either gratuities or gifts from a rich friend. This contention is frivolous.

As we have stated too often to warrant the citation of authority, a defendant challenging the sufficiency of the evidence on appeal bears a heavy burden. We must view the evidence in the light most favorable to the government, resolving all issues of credibility in its favor and drawing all permissible inferences of guilt.

Moreover, the "agreement or understanding" element of bribery "is indistinguishable from a conspiratorial agreement," and accordingly "may be proven by circumstantial evidence." *United States v. Covino*, 837 F.2d 65, 70 (2d Cir.1988); *cf. United States v. Young*, 745 F.2d 733, 762

---

**2.** In view of our disposition of the mail fraud counts, *see infra* Discussion Part G, we need not address Shafran's claim that the evidence is insufficient to support his conviction on the bribery-related mail fraud counts (Counts Eight and Nine).

(2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. *Cf. United States v. Manton,* 107 F.2d 834, 839 (2d Cir.1939) ("often if not generally, direct proof of a criminal conspiracy is not available"), *cert. denied,* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.

In the instant case, there is abundant evidence of such conduct and such a state of mind. The evidence shows that Sandow, at the behest of Lindenauer, engaged in a concerted effort to influence Shafran's official judgment by wining and dining him and ultimately by giving him cash. The evidence also shows that after these efforts began, Shafran's attitude toward Sandow's firm, SRS, quickly turned from opposition to favoritism, even to the point of Shafran's asking Joseph Delario of Datacom to refrain from bidding against SRS. Moreover, although Shafran refused Sandow's offer of a bribe to stay at the PVB, his avowed reason for this refusal was his belief that he could control the PVB on behalf of Sandow just as easily from the outside. Indeed, while stating his firm intention to leave the PVB and declining the bribe for that proffered reason, Shafran nevertheless asked if he could still get the money if the rental-car contract was renewed. Finally, Shafran's acceptance of cash literally underneath a table and his later suspicion that he was being taped hardly reflect an innocent state of mind.

Shafran fares no better with respect to the BJV consulting contract. Before granting his approval for the in-state towing program, Shafran asked Bernard Sennet for a partnership in Sennet & Krumholtz. In lieu of this partnership, however, Shafran agreed to accept the consulting contract. Shafran subsequently gave the in-state towing program his final approval in February 1985. Sennet, Sandow and Lindenauer all understood that the consulting contract was necessary to ensure Shafran's cooperation. Sennet observed, for example, that the contract was the means by which the BJV would "take care of Lester," and Shafran told Sandow in 1985 that "[t]he towing joint venture is my idea, and you owe me." Finally, Lindenauer, alluding to his previous difficulties with Shafran concerning SRS, warned Sandow:

> You've got to make sure that Lester is comfortable and taken care of in terms of this thing or else the program is not going to fly and I'm tell[ing] you right now, Bernie, I'm not going to get into another one of these battles with Lester. It just isn't going to work, as far as Lester is concerned. It's his program; he orchestrated the whole program, and I'm not looking for this kind of grief.

From the timing of Shafran's solicitation and from his openly proprietary interest in the towing program, the jury could hardly have reached any conclusion other than that Shafran knowingly used the implied threat of delay or disapproval of the BJV contract in order to extract the consulting-contract bribe from Sennet.

(b) *Proposed "Gift" Instruction.* Shafran also contends that his RICO convictions should be reversed because the district court failed to instruct the jury that it could find the Sandow benefits to be gifts, rather than bribes or gratuities. Specifically, he objects to the district court's refusal to give his proposed instruction that "a public servant may receive something from a friend or associate which is not a gratuity focused on his public office at all. If that is so, then there is no violation of any kind, be it a City rule or anything else."

We first address the question whether, under Fed.R.Crim.P. 30, the objection was properly preserved for appellate review. In addition, because Lazar's challenge to the multiple-conspiracies charge (*see infra* Part B(1)(b)) raises a similar question under

Rule 30, we address Lazar's waiver arguments here as well.

■ The government asserts that Shafran and Lazar did not make specific objections to the district court's instructions on bribery and multiple conspiracies, respectively. Both Shafran and Lazar concede as much, but contend nevertheless that their requests to charge preserved these claims. This contention, however, defies the plain language of Rule 30, which at the time of the trial stated in pertinent part:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

Fed.R.Crim.P. 30 (emphasis added). The separate references in Rule 30 to charge requests and to objections clearly indicate that a charge request does not relieve a party of the obligation to make a specific objection. *See United States v. McCaskill,* 676 F.2d 995, 997 n. 3 (4th Cir.), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982); *cf. United States v. Barash,* 412 F.2d 26, 33 (2d Cir.) (failure to object to trial court's omission of agreed-upon compromise instruction did not preserve claim), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). Moreover, a requested charge is not a "distinct" objection to a charge adopted by the district court. Even when the language selected by the district court is substantially different from language proposed by the defendant, the differences may or may not be material. Rule 30 thus serves the important purpose of relieving the district court of the significant burden of having to guess which differences in language are considered material by the parties. Avoiding such guesswork is particularly important in a case involving four defendants and potentially five sets of proposed charges. Rule 30 also "give[s]" the trial court an adequate opportunity to correct any mistakes in the jury charge." *United States v. Hamilton,* 684 F.2d 380, 385 (6th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982).

Lazar nevertheless asserts that his failure to object is excused because the district court stated during charge conferences that it wished only to hear "comments," and because the court, immediately after delivering the charge, instructed counsel not to repeat points already expressed on the record. Shafran similarly points out that "[r]epeatedly during the trial, the district court stressed that once counsel made a request or an argument, counsel need not reassert it to preserve appellate rights."

Counsel had ample opportunity during Judge Knapp's lengthy charge conferences, however, to make specific objections to language contained in, or omitted from, the proposed instructions. At these conferences, Judge Knapp patiently read aloud each line of his proposed instructions and permitted counsel to interject with comments, criticisms and proposed alternative language. For instance, immediately after Judge Knapp had recited the proposed RICO conspiracy charge during a session held on November 19, 1986, counsel for the government asked the court "to charge the jury that people could participate in the conspiracy at different times, and you don't have to be in the conspiracy during the entire length of it." None of the defendants, however, made any objection or "comment" regarding the multiple-conspiracies language. The next day, when the bribery instruction was reviewed, counsel for Shafran made no mention of "gifts" but instead engaged in a lengthy discussion, set forth

in the margin,[3] about the instruction's references to his other contentions regarding the Candler Building and the Sandow benefits. In addition, after the charge was given to the jury, counsel for Shafran objected to the particular phrasing of the instruction without addressing its failure to mention "gifts."[4]

Shafran and Lazar thus had ample opportunity to object to the jury instructions in question, and we see no reason to excuse their failure to comply with Rule 30. *See Barash*, 412 F.2d at 33; 2 C. Wright, *Federal Practice and Procedure* § 484 (1982) ("A party who has requested an instruction that has not been given is not relieved of the requirement that he state distinctly his objection to the instruction that is given."). Accordingly, their objections to Judge Knapp's charge are waived unless the charge constitutes "plain error." Fed.R. Crim.P. 52(b).

■ We find no plain error in the district court's failure to include any reference to "gifts" in its bribery instruction. The charge clearly and correctly set forth the elements of bribery. In addition, the jury received the following instructions:

> Some of the defendants have argued that certain of the benefits alleged to have been conferred or received were not bribes but gratuities. A gratuity re-

---

3. The discussion reads as follows:

MR. SCHWARTZ [for the government]: Your Honor, the next thing is on page 44, concerning Mr. Shafran. At the bottom of the page, where you say "Shafran contends that the opportunity was a gratuity.["] I don't think Mr. Silverman argued that, and I don't think that should be in the charge. He argued that—he argued that it wasn't a bribe. [H]e didn't argue it was a gratuity—

MR. SILVERMAN [for defendant Shafran]: Say no more, Mr. Schwartz. That is exactly my position, your Honor, I would ask that your Honor remove at the top of page 45 after the word—

MR. SCHWARTZ: I'm going to ask Mr. Silverman if he's going to argue anything from Mr. Sandow as a gratuity.

MR. SILVERMAN: I think I already—

THE COURT: Wait a minute. *You want to say Shafran contends the opportunity to invest in the Candler Building had nothing to do with the affairs of the PVB?*

MR. SILVERMAN: Period. I'm not arguing that it was a gratuity.

THE COURT: You want it to say Shafran contends the opportunity to invest in the Candler Building had nothing to do with affairs of PVB.

MR. SILVERMAN: Period.

THE COURT: This contention, tried to—

MR. SILVERMAN: Yes, sir, I'm not arguing it was a gratuity.

MR. SCHWARTZ: *Similarly, your Honor, as long as we're on the subject, I would ask Mr. Silverman if he's going to argue that the thing that we contend Mr. Shafran received from Mr. Sandow was gratuities. If he's not going to argue that, we think the gratuity language should be stricken.*

MR. SILVERMAN: *I think I have argued and I intend to argue if the jury does believe that Mr. Shafran did receive any of the economic benefits that Mr. Sandow did testify to, they could conclude that it was gratuity.*

MR. SCHWARTZ: If he's going to argue that, we have no objection. Page 46, your Honor.

4. Specifically, counsel objected to the portion of the charge that stated that "Shafran argues that ... the Government has not succeeded in proving beyond a reasonable doubt that Shafran considered [the Sandow benefits] as anything but mere gratuities. [If] [t]his contention raised a reasonable doubt in your mind, you must find racketeering acts 8 through 15 not proven against Shafran." The objection, and the ensuing colloquy, reads as follows:

MR. SILVERMAN: The other item I want to bring to the Court's attention, at page 50, referring to the gratuities, I think the language should be that if they find that they were gratuities, not bribes, then they must find the defendant not guilty.

THE COURT: I said, if it raises a reasonable doubt in your mind, you must find them not guilty.

MR. SILVERMAN: The way I read it, it doesn't come out that way. I read it four or five times, and if the Court can look at it tonight and see whether or not it comports with my interpretation. It seems to say that we argue that the payments have been made and the—if the Government has not succeeded beyond a reasonable doubt, Shafran—*if the jury finds that Mr. Sandow intended them as mere gratuities,* in that case they must find that there was no bribe—

THE COURT: What they have to find is what Mr. Shafran intended, not what Mr. Sandow intended.

MR. SILVERMAN: According to the Government's proof, *if the jury believes that Mr. Sandow intended them as mere gratuities,* then factually they couldn't find that Mr. Shafran thought of them as briberies.

MR. SCHWARTZ: That's not so.

\* \* \* \* \* \*

THE COURT: I think I'll let it stand.
(emphasis added).

wards an official for conduct already performed, and does not involve the intent by either the giver or receiver that future exercises of official discretion will be influenced. If you find that a particular instance of alleged bribery involved the payment or receipt of a gratuity, i.e. a reward for past services, and not a bribe, you must find such act of alleged bribery not proven.

\* \* \* \* \* \*

With respect to these acts [the Sandow benefits], Shafran argues that even if you should find these payments to have been made, the Government has not succeeded in proving beyond a reasonable doubt that Shafran considered them as anything but mere gratuities. [If] [t]his contention raised a reasonable doubt in your mind, you must find racketeering acts 8 through 15 not proven against Shafran.

\* \* \* \* \* \*

Aside from his general contention that the Government has failed to prove this act beyond a reasonable doubt, Shafran argues that the consulting contract constitutes at most a gratuity rewarding him for his past services, with no expectation of its affecting his exercise of official discretion in the future. If this contention raises a reasonable doubt in your mind, you must find alleged racketeering act 16 not proven.

If you find, obviously, if you find that the alleged contract was simply hiring him to do a job, and it had nothing to do with [the] Parking Violations Bureau, then also that would defeat the Government's claim.

"[R]ead as a whole," *United States v. Colon,* 835 F.2d 27, 32 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988), the district court's charge properly conveyed to the jury "the substance of [the] defendant's request ... [in the court's] own language." *United States v. Borello,* 766 F.2d 46, 55 (2d Cir. 1985) (quoting *United States v. Taylor,* 562 F.2d 1345, 1364 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977)).

In any event, we do not believe that the charge precluded the jury from finding that the Sandow benefits were gifts. Having been instructed on the elements of bribery, and having been told that gratuities are not bribes and that the BJV consulting contract would not be a bribe if it were unrelated to Shafran's future official duties, no jury could reasonably have concluded that a true gift could be a bribe.

2. *Kaplan: Bribery of Manes*

Kaplan's RICO convictions are predicated upon the jury's conclusion that he had committed two racketeering acts—the bribery of Lindenauer and the bribery of Manes—during his efforts to obtain on behalf of Citisource the PVB contract for the development of the handheld computer. Kaplan contends, however, that his RICO convictions must be reversed because the evidence was insufficient to prove that he had intended to bribe Manes.

Lindenauer testified that he and Kaplan met at Kaplan's office in the spring of 1982, only a few days after the Deputy Commissioner of the DOT refused to grant a sole-source contract for the hand-held computer. According to Lindenauer, at this meeting

Marvin [Kaplan] said to me that if his company were to win ... the hand-held issuing contract itself, that he would give stock to me and Donny [Manes] that—we would get approximately a minimum of $500,000 a man for this.

Q. And when Mr. Kaplan said that to you, what did you say to Mr. Kaplan?

A. I said I would get back to him.

Lindenauer testified that he immediately reported Kaplan's offers to Manes. According to Lindenauer, Manes "said to me that this was serious money and that the real problem [would be deciding] who would be holding the stock for us." Manes nevertheless observed that "[t]his is the kind of problem I like." Within the next two days, Manes told Lindenauer that Friedman should hold the stock for them. According to Lindenauer, Lindenauer then reported back to Kaplan:

Q. What did you say to Mr. Kaplan and what did he say to you?

A. I told Marvin that we would go ahead with the project itself. I would do everything I could to make sure that he won the contract, and that Stanley would get all the stock for the three of us.

Q. What did Mr. Kaplan say to you?

A. He said, "Fine."

Over the next few months, Lindenauer met a number of times with Kaplan and with Robert Richards, president of Citisource, to devise a method of guaranteeing that the RFP for the hand-held computer would be favorable to Citisource. *See generally supra* Background Part B(5). In April 1983, Lindenauer met with Kaplan in Kaplan's office and said,

"Marvin, when am I going to be getting the stocks, and what is the amount?" And Marvin said to me that there would be 57,500 shares given for me, 57,000 for Donald—500 for Donald, 57,500 for Stanley.

I said, "What are we—when are we going to get these stocks?"

Marvin said, "Within the next few days. I'll have the stocks drawn up. We just have to go through standard legal procedures in terms of how stocks are drawn up, and then I'll get the shares to Stanley."

By early May, however, the stock had not yet been delivered, even though the PVB selection committee was soon to make its choice. Lindenauer testified to the following conversation with Richards:

Q. What did you say to Mr. Richards and what did he say to you?

A. Bob said to me, "Make sure you get the stock before the selection committee meets, because" he said, "you've got to understand something. The Kaplan[s] are pigs and they may play all kinds of games with you. Make sure you get the stock."

Q. What did you say to Mr. Richards?

A. I said okay, I would.

Q. Did you say anything else to Mr. Richards?

A. Yes. I said, you know, "I hear what you're saying, but to me, they would be foolish to play any kind of silly games, because if they played any kind of games, it wouldn't get past. And even if we passed it at the selection committee, if they were still playing games, it had to go through the Board of Estimate, and Donald, Stanley—and Stanley would stop it." So I said, "I'll do it, but it seems to me just dumb that they would try to pull something like that."

Approximately one year later, the contract was approved by the Board of Estimate, of which Manes was a member.

■ Kaplan launches two attacks upon the evidence detailed above. First, Kaplan challenges Lindenauer's credibility by pointing to the alleged "evolution" of Lindenauer's testimony between his appearances before state and federal grand juries and his testimony at trial. Such a challenge to the credibility of a witness, however, must be made in cross-examination and in subsequent argument to the jury, not in an appellate brief. It is not a function of an appellate court to "second-guess a jury's finding on credibility," *United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726, 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986), and we will not do so here.

Second, Kaplan contends that the evidence of his bribe to Manes is insufficient because there is no *direct* evidence that he had given Citisource stock to Manes with the intention of influencing Manes's exercise of official discretion. Kaplan's view of the evidence is that Manes was Lindenauer's "rabbi," or political patron, and that giving Citisource stock to Manes was simply part of the bribe to Lindenauer intended to bring about PVB approval of the Citisource contract. Kaplan is driven to this strained argument, of course, by the need to reduce the predicate acts from two to one in order to upset his RICO conviction.

There is, however, abundant evidence of Kaplan's intent to bribe Manes. Manes, one of the most powerful politicians in the City, was a member of the Board of Esti-

mate, a body whose approval was needed to execute the Citisource contract. Given the need for Board of Estimate approval, the evidence that Manes knew the role he was to play in securing that approval, and Manes's request for information as to when the contract would come before the Board of Estimate, the jury clearly could conclude that the stock was a bribe intended to influence Manes's official conduct.

### 3. *Kaplan: Perjury*

Kaplan also contends that his perjury conviction must be reversed on the ground that his sworn testimony before the SEC was literally true. In that testimony, he was asked why the initial issue of Citisource stock was allocated as it had been, and in particular, why Friedman was the largest shareholder. The relevant portion of Kaplan's testimony—with the allegedly perjurious portion placed in emphasis—reads as follows:

Q. The initial shares, were they allocated in any specific sense of the word for different directors or officers?

A. Yes.

Q. Who made the allocations?

A. Al Kaplan.

Q. Did he do that by himself?

A. Yes.

Q. And what basis did he use to make the allocation?

A. Same basis that we would have used in every venture we ever went into, my brother and myself. He makes it up, and he says, "Here, it is; implement it. That is all I'm willing to sell to any one person."

And he has reasons why he feels that this one should get this and that one should get that, et cetera.

Q. Is there any reason that you know of why Stanley Friedman received the largest block of shares of the company?

A. I don't know about the largest block, because—I would like that question more clarified, because the four of us, KKKK, owned all the shares. And the four of us, as a block, owned more shares than anyone else.

Q. Okay. Who was the largest individual shareholder of Citisource?

A. I have to look at the prospectus.

Q. Go ahead. It indicates—

(Pause).

A. As of this date—and I want to preface it by saying of the inside shares—it appears that Mr. Friedman is the single largest stockholder. This doesn't preclude any outside person unbeknown to myself owning a block of more shares.

Q. The inside stock that we are talking about right now, is that the stock that was allocated by Albert Kaplan?

A. Yes.

Q. My question again is, on what basis was the allocation made?

A. *You would have to ask Al Kaplan. Al Kaplan is my brother, and I never argue with him in that respect. He has his reasons why. He feels that so and so, he should give this to; maybe a moral obligation. I know Stanley has been a friend of ours for a long time, and he has done a lot of things for us for no remuneration. And he has given us a lot of thought and ideas and spent a lot of time with us.*

*I know for a fact that when I spoke to Stanley of my idea, that he did ask and say, "If you ever do anything with this company, I would like to partake in it."*

*And on that basis, my brother felt that he is—and Stanley is an individual who at the time was affiliated, if I am correct, with Sachs–Bachman [sic], which is the firm that Ray [sic] Cohen [sic] is with, and it is a very prestigious law firm.*

*And I felt on that basis he would be an asset to us on a national basis—to introduce us, to advise us, to help us in every way possible. And that is the reason why, to the best of my knowledge.*

The questioning then turned to other topics.

■ The federal perjury statute, 18 U.S.C. § 1621 (1982), provides that a witness is guilty of perjury if, while under oath, he or she "willfully and contrary to

such oath states or subscribes any material matter which he does not believe to be true." This language must be construed strictly. In *Bronston v. United States*, 409 U.S. 352, 357–58, 93 S.Ct. 595, 599, 34 L.Ed.2d 568 (1973), the Supreme Court held that Section 1621 "does not make it a criminal act for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true," even when the testimony is designed to, and does, mislead. Thus, Section 1621 does not proscribe "answers unresponsive on their face but untrue only by 'negative implication.'" *Id.* at 361, 93 S.Ct. at 601. Combating mere unresponsiveness must be left as a challenge to the "questioner's acuity." *Id.* at 362, 93 S.Ct. at 602 (quoting *United States v. Bronston*, 453 F.2d 555, 563 (2d Cir.1971) (Lumbard, J., dissenting), *rev'd*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973)). Nevertheless, the issue of literal truth is to be resolved by a properly instructed jury. *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir.1986).

■ Relying on *Bronston*, Kaplan argues that his SEC testimony, while perhaps unresponsive and incomplete, was literally true. Specifically, he contends that he merely engaged in "speculation about the possible reasons his brother allocated the stock," and that these reasons were not "false" because relatives, friends and employees of the Kaplans were in fact allowed to purchase Citisource stock at a discount. Accordingly, Kaplan submits that the evidence was insufficient to support the jury's finding that his testimony was false. We disagree.

Kaplan's testimony on its face refutes his contention that his ultimate response to the questions about the allocation of Citisource stock was framed in speculative terms. Kaplan's efforts to avoid giving a direct answer were worn down by the persistence of his examiner, and despite his evasive remark that "[y]ou would have to ask Al Kaplan," he nevertheless concluded: *"And I felt on that basis* he [Stanley Friedman] would be an asset to us on a national basis—to introduce us, to advise us, to help us in every way possible. *And that is the reason why, to the best of my knowledge."* Kaplan thus stated that he believed that Friedman received his Citisource stock because Friedman's prominence and influence would be an "asset" to the firm.

There was abundant evidence from which the jury could have concluded that this answer was intentionally false. For example, Robert Richards testified that, when he asked Kaplan about Lindenauer's concern about Friedman's stock, "Kaplan erupted.... [He] began ... screaming ..., 'It's none of your God damn business what I do. I run the company. I'll make any decision I want to about stock." Richards also testified that, several days after this outburst, Kaplan explicitly admitted that Friedman had been given stock for the purpose of providing shares for Manes and Lindenauer. In addition, both Richards and Lindenauer testified extensively about other discussions with Kaplan about the bribery scheme involving the Citisource stock. Although it may well be true, as Kaplan argues, that his brother performed the actual allocation of the Citisource stock, there can be little doubt that Kaplan knew that Friedman had become Citisource's largest stockholder in order to bribe Lindenauer and Manes. *See also supra* Discussion Part A(2). Kaplan's perjury conviction is therefore amply supported by the evidence.

### B. *Misjoinder and Severance*

Three defendants, Lazar, Shafran and Friedman, argue that they were prejudiced as the result of having been tried with their co-defendants. In this section, we address the claims of Lazar and Shafran, both of whom contend that they should have been severed essentially because they were not properly alleged or proven to be members of the RICO conspiracy charged in Count Two.

#### 1. *Lazar*

(a) *Misjoinder.* Under Fed.R.Crim.P. 8(b), "[t]wo or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense

or offenses." Although Rule 8(b) limits a prosecutor's power to charge multiple defendants in a single proceeding, that power is probably at its greatest when RICO conspiracy charges are brought. As Judge Sofaer has observed:

> The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense. The presence of a substantive RICO count under 18 U.S.C. § 1962(c), and of a RICO conspiracy count under 18 U.S.C. § 1962(d), further broadens the government's power to charge multiple defendants together. A RICO charge under § 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise. In short, by loosening the statutory requirements for what constitutes joint criminal activity, Congress limited the force of Rule 8(b) in such situations.

*United States v. Castellano*, 610 F.Supp. 1359, 1396 (S.D.N.Y.1985). We have similarly noted that "a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a 'pattern of racketeering activity' under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial." *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *accord United States v. Teitler*, 802 F.2d 606, 616 (2d Cir.1986). In evaluating the defendants' claims of misjoinder under Rule 8(b), then, our task is limited simply to determining whether the indictment properly alleged their participation in a RICO conspiracy.

■ Lazar claims that he was misjoined because the indictment failed to allege facts sufficient to establish his membership in the single RICO conspiracy charged in the indictment. Specifically, he contends that "nothing in the indictment connects" him with either Friedman or Kaplan and that allegations of his bribery on behalf of Datacom and Miller & Rothman did not suffice to support an inference of conspiratorial agreement among Lazar and his codefendants. As explained in more detail in Part B(1)(b) immediately *infra*, a RICO conspiracy is by definition broader than an ordinary conspiracy to commit a discrete crime. Each member of a RICO conspiracy need only conspire to participate in the affairs of the alleged enterprise through two predicate crimes. Unrelated crimes by others participating in the affairs of the enterprise are thus part of the RICO conspiracy. Accordingly, the indictment properly alleged Lazar's membership in an overall conspiracy to operate the PVB as a racketeering enterprise.

(b) *Proof of a Single Conspiracy.* In an extension of his misjoinder argument, Lazar asserts that his RICO conviction should be reversed because the evidence at trial demonstrated the existence of multiple conspiracies instead of the single RICO conspiracy charged in the indictment. He argues that the government presented no evidence of any conspiratorial agreement between Lazar and the defendants added in the fourth superseding indictment, Friedman and Kaplan. According to Lazar, the government proved "some eight conspiracies, with Lazar and the PVB on the one hand and the added defendants and the PVB in a variety of schemes on the other." Lazar asserts that the government's evidence of multiple conspiracies created a material variance. These contentions are also without merit.

■ Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury. *E.g., United States v. Nersesian*, 824 F.2d 1294, 1302 (2d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 355, 357, 98 L.Ed.2d 382 (1987), — U.S. ——, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Although Judge Knapp gave the jury an instruction on multiple conspiracies, Lazar contends that the instruction was inadequate and failed "even to submit [the issue] intelligibly" to the jury. Because Lazar waived this claim by failing to object

**562**

in the district court, *see supra* Discussion Part A(1)(b), we review the multiple-conspiracies charge for plain error.

 The charge, which is set out in the margin,[5] correctly stated that the jury could not convict unless it found that the defendant was a member of the conspiracy described in the indictment. *See, e.g., United States v. DiTomasso,* 817 F.2d 201, 211 & n. 11 (2d Cir.1987). The apparent objection to the charge is that it lacked language specifically referring to the possibility that the jury might find conspiracies other than, or in addition to, the one alleged in the indictment. Whether or not inclusion of such language is preferable, its omission hardly amounts to plain error going "to the very essence of the case." *United States v. Calfon,* 607 F.2d 29, 31 (2d Cir.1979) (per curiam) (quoting *United States v. Fontenot,* 483 F.2d 315, 322 (5th Cir.1973)), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980). Judge Knapp's instruction plainly stated that Lazar could be convicted only of the conspiracy charged in the indictment and that he had to be acquitted if he was guilty of membership in a conspiracy other than the one charged. A jury following that instruction could not have convicted Lazar of some other conspiracy.

 The only remaining question is whether the evidence was sufficient to support the jury's conclusion that the government had proven Lazar's membership in the single RICO conspiracy charged in the indictment. Proof of a single conspiracy requires evidence that the alleged coconspirators "agreed on a 'common purpose' that sufficed to render their activities 'a single enterprise.'" *United States v. Heinemann,* 801 F.2d 86, 92 (2d Cir.1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed.

1557 (1946)), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). At the same time, however, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations." *Id.* (quoting *United States v. Cambindo Valencia,* 609 F.2d 603, 625 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980)). Moreover, there is no requirement that each member of a conspiracy conspire directly with every other member of the conspiracy. This is especially true with respect to a RICO conspiracy. As the Fifth Circuit has explained:

> The gravamen of a RICO conspiracy charge "is that each [defendant] agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes." *Under RICO it is irrelevant whether "each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs."*

*United States v. Stratton,* 649 F.2d 1066, 1074 (5th Cir. Unit A July 1981) (citation omitted) (emphasis added) (quoting *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). A RICO conspiracy is thus by definition broader than an ordinary conspiracy to commit a discrete crime such as bribery. So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other "does not convert the single agreement to conduct the affairs of an enterprise through a pat-

---

**5.** Then there is another important rule of which you should be aware. In order to convict any defendant of a conspiracy the Government must prove beyond a reasonable doubt that he was guilty of the particular conspiracy alleged in the indictment. It would be wholly immaterial that the Government might prove that the defendant was involved in other or different conspiracies. As I have indicated, the particular conspiracy alleged in this indictment is the alleged agreement among Manes, Lindenauer and others to convert the New York City Parking Violations Bureau into a vehicle for their own enrichment through unlawful activities. Unless the Government has proven a defendant's knowing and willful participation in that particular conspiracy he must be acquitted of this count, whether or not he may have been guilty of other unlawful or conspiratorial conduct.

tern of racketeering activity into multiple conspiracies." *United States v. Persico*, 621 F.Supp. 842, 856 (S.D.N.Y.1985).

■ We have no difficulty in concluding that the evidence supported the jury's finding of a single RICO conspiracy. Here, the RICO enterprise was the PVB, a municipal agency rife with corruption. Faced with abundant evidence that Lazar had paid bribes on behalf of two firms—Datacom and Miller & Rothman—the jury could easily have found that he knew that bribery was an important, if not essential, tool in ensuring success in obtaining contracts from the PVB. The jury could then have concluded that Lazar knew that he was not simply participating in isolated bribery conspiracies but rather in the broader conspiracy charged in the indictment, a conspiracy to operate the PVB for private gain through a pattern of racketeering activity.

Lazar's multiple-conspiracies claim rests heavily on his lack of direct contact with either Kaplan or Friedman, and on the evidence that he and Friedman were "if anything[,] ... competitors of sorts." This observation, however, misses the point. As already noted, each member of a conspiracy need not directly conspire with every other member. If anything indeed, the arguably competitive relationship between Lazar and Friedman actually supports the jury's finding that each had participated in the affairs of the PVB. Specifically, the fact that Delario, at Kaplan's suggestion, decided to employ Friedman in Lazar's former role as Datacom's bribe conduit supports the view that Friedman had succeeded Lazar in fulfilling a single role in an ongoing conspiracy to operate the PVB for private gain. Finally, Delario's expressed hope that Lindenauer would be "more comfortable" with Friedman than he had been with Lazar suggests that Delario and others shared the view that Friedman and Lazar had successively filled a single job in a continuing enterprise. Accordingly, we find no merit in Lazar's multiple-conspiracies claim.

■ (c) *Prejudicial Spillover.* Lazar nevertheless asserts that he was prejudiced by the admission of a great deal of evidence that he contends would have been inadmissible against him in a "properly severed" trial. Although he makes no reference to Fed.R.Crim.P. 14, we construe this argument as a claim that Judge Knapp erred in refusing to sever his trial under Rule 14. We conclude, however, that the claim so construed has no merit.

■ A defendant raising a claim of prejudicial spillover bears an extremely heavy burden. Indeed, a motion to sever under Rule 14 is committed to the discretion of the trial court and is "virtually unreviewable." *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir.) (quoting 8 J. Moore, *Moore's Federal Practice* ¶ 14.02[1], at 14–3 (2d ed.1977)), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). To show an abuse of this discretion, it will not suffice simply to establish that a defendant would have had a better chance of obtaining an acquittal at a separate trial. *E.g., id.; United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir.1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). Rather, the defendant must show that he or she suffered prejudice so substantial as to amount to a "miscarriage of justice." *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir.1984), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Lazar has clearly failed to make a colorable showing that he has suffered such substantial prejudice. As already noted, the evidence was sufficient to establish that each of the defendants had participated in a single RICO conspiracy. Lazar was thus a "fully implicated conspirator, and most of the evidence of which he complains would have been admissible against him in a separate trial as acts of co-conspirators in the furtherance of a conspiracy." *Id.* at 1178; *see also United States v. Nersesian*, 824 F.2d at 1304 (in trial lasting five months, government entitled to present "the entire range of evidence of the conspiracy" against each of sixteen defendants). Lazar's contrary contention, that much of the evidence at trial would have been inadmissible in a "properly severed" trial, is based on the already-rejected

**564**

premise that he and his co-defendants were not co-conspirators. In any event, Lazar's acquittal of the racketeering act involving his alleged bribery of Shafran demonstrates that the jury individualized its consideration of the evidence against each defendant.

### 2. *Shafran*

■ (a) *Misjoinder.* Shafran's claim of misjoinder under Rule 8(b) rests heavily on the fact that he was acquitted of a bribery racketeering act relating to his investment in the Candler Building, a commercial property in midtown Manhattan. The government sought to prove that Shafran's interest in the building was the product of a bribe offered by Lazar on behalf of Datacom. The jury, however, apparently believed Shafran's contention that he had paid fair market value for his investment. Pointing to the government's pretrial emphasis on Datacom as providing the link among the defendants, Shafran now asserts that the Candler Building allegations were the "sole basis" offered by the government for linking him with his co-defendants and that the government joined him without a "reasonable expectation" that these allegations would be proven at trial. *See United States v. Ong*, 541 F.2d 331, 337 (2d Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793, 430 U.S. 934, 97 S.Ct. 1559, 51 L.Ed.2d 780 (1977). Accordingly, Shafran contends that the government joined him in bad faith and that his conviction should be reversed. This argument is frivolous.

The Candler Building allegations were not the sole basis for Shafran's joinder. The indictment charged him with having accepted eight bribes from SRS through Sandow and with having accepted a bribe in the form of a consulting contract from the BJV through Sennet and Jochnowitz. These accusations alone were sufficient to support the indictment's overall allegation that Shafran had participated in a conspiracy to operate the PVB as a racketeering enterprise and provided a sufficient basis for joinder. Shafran's claim of misjoinder must therefore be rejected.

■ (b) *Prejudicial Spillover.* Shafran nevertheless asserts that because the government did not prove that he had accepted a bribe from Datacom, he could not have been part of the RICO conspiracy and was therefore improperly joined. In particular, Shafran characterizes the BJV consulting-contract bribe as being too "peripheral" to tie him to the RICO conspiracy, because the BJV episode did not involve Lazar, and because Shafran's only contact with Friedman concerning the BJV consulting contract consisted of a single conversation. Additionally, Shafran emphasizes the fact that Lindenauer, Sandow and others attempted to keep him ignorant of certain illegal activities primarily involving Lindenauer and Manes.

There was more than sufficient evidence, however, to support the jury's conclusion that Shafran had conspired to "participate . . . in the conduct of [the PVB's] affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Specifically, there was ample evidence that Shafran, as Director of the PVB, knew that he was participating not merely in discrete bribery schemes, but more generally in the corruption that pervaded his agency. For instance, Sandow testified that on one occasion, Shafran stated his belief that Lindenauer was "taking from everybody." And both Lindenauer and Sandow testified that Shafran had asked each individually whether Sandow was paying cash bribes to Lindenauer. Although Shafran's inquiries prompted denials from both Lindenauer and Sandow, given Sandow's comment about Lindenauer and Shafran's own receipt of cash from Sandow, the jury was free to conclude that Shafran knew the truth. Accordingly, the jury could have concluded that, in accepting cash from SRS and the consulting contract from the BJV, Shafran knew that he was participating in a much larger effort to operate the PVB as a corrupt enterprise. That he might not have known many of the details of that larger effort is simply of no legal consequence.

Finally, Shafran contends that he was prejudiced by the district court's refusal to grant his motion for severance under Rule

14. Like Lazar, however, Shafran has failed to make a showing of prejudice. Because Shafran was properly found to be a member of a conspiracy to participate in the affairs of the PVB involving all of the defendants, the evidence used to prove that conspiracy was admissible against him. Moreover, the jury's acquittal of the alleged Candler Building bribes belies Shafran's claim of prejudicial spillover.

## C. *The Citisource Bribes and Kaplan's RICO Convictions*

As explained *supra* (Background Parts A, B(5); Discussion Part A(2)), Kaplan was charged with, and convicted of, two RICO predicate acts: the payment of a bribe to Lindenauer in the form of Citisource stock and the payment of an identical bribe to Manes. Kaplan proffers two contentions as to why these bribes cannot support his RICO convictions. First, he argues that his transfer of Citisource stock to Manes and Lindenauer does not constitute two predicate acts under RICO because they were part of a single act or "criminal transaction" and could not be separately prosecuted or punished under New York law. Second, Kaplan argues that, even if the Citisource bribes were two predicate acts, they did not constitute a "pattern of racketeering activity." We find the first contention to be without merit but reserve decision on the second pending in banc review of a similar issue in an unrelated case.

### 1. *The Citisource Bribes as Two Predicate Acts*

New York's Criminal Procedure Law contains several provisions governing double jeopardy that "go[ ] much farther" and "provid[e] greater protections" than do the federal and New York Constitutions. N.Y. Crim.Proc.Law § 40.10 practice commentary (1981). In contending that the Citisource bribes cannot constitute two predicate acts, Kaplan relies in part upon N.Y. Crim.Proc.Law § 40.20(2) (McKinney 1981), which provides that in general "[a] person may not be separately prosecuted for two offenses based upon the same act or criminal transaction." A "criminal transaction" for the purposes of Section 40.20

> means conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture.

*Id.* § 40.10(2). Kaplan submits that these provisions preclude the Citisource bribes from constituting separate predicate acts. He also contends that under N.Y. Penal Law § 70.25(2) (McKinney 1987), which bars the imposition of consecutive sentences "on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other," the Citisource bribes are punishable only as a single offense and cannot constitute separate predicate acts.

However, state procedural rules such as those relied upon by Kaplan are irrelevant under RICO.[6] "[R]acketeering activity" under RICO includes "any act ... involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A) (Supp.IV 1986). In *United States v. Paone*, 782 F.2d 386, 393 (2d Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), ─ U.S. ─, 107 S.Ct. 3261, 3262, 97 L.Ed.2d 761 (1987), we observed that this language was "not intend[ed] to incorporate the various states' procedural and evidentiary rules into the RICO statute" but was instead "meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge." We thus held in *Paone* that the

---

**6.** Because we hold the state procedural rules to be irrelevant, we do not reach the question of whether Kaplan's conduct would in fact be separately chargeable and punishable under state law. Accordingly, we deny Kaplan's motion for certification of that question to the New York Court of Appeals.

RICO statute did not incorporate for purposes of a RICO predicate crime a New York rule forbidding convictions based on uncorroborated accomplice testimony. *Id.* at 394. In reaching this conclusion, we emphasized that "appellant's reading of 'chargeable' would result in precisely the same criminal act, proscribed by the laws of two states, being the basis of a RICO violation in one state but not in the other—simply because of differences in what are essentially procedural rules." *Id.* at 393.

*Paone* controls here. New York's rules governing double jeopardy and consecutive sentencing do not affect the generic definition of the crime of bribery. Instead, they are essentially procedural rules governing prosecutions for all crimes in New York. It is not disputed that the bribe to Lindenauer was chargeable and punishable under New York law, as was the bribe to Manes. Each was thus a bribe under New York's definition of bribery, even though they both could not be (we assume, *see supra* note 6) separately charged and punished. Because the definition of bribery is unaffected, the two bribes to Manes and Lindenauer remain "chargeable under State law and punishable" for the purposes of RICO and constitute separate predicate crimes. *See United States v. Licavoli*, 725 F.2d 1040, 1046–47 (6th Cir.) (murder and conspiracy to commit murder could serve as two separate predicate acts even though defendants could not have been charged with and punished for both crimes under Ohio law), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984).

### 2. *The Citisource Bribes as a Pattern of Racketeering Activity*

Having thus determined that the Citisource bribes properly constitute two predicate acts, we must reach Kaplan's alternative contention that the two Citisource bribes do not constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5) (1982). In making this argument, Kaplan relies heavily upon the now-famous footnote fourteen in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), in which the Supreme Court suggested in dictum that two predicate acts, while necessary to establish a pattern of racketeering activity, might not be sufficient to do so. *Id.* at 496 n. 14, 105 S.Ct. at 3285–86 n. 14; *see* 18 U.S.C. § 1961(5) (" 'pattern of racketeering activity' requires at least two acts of racketeering activity"). In particular, Kaplan points to the *Sedima* footnote's quotation of the following language from the Senate Report on RICO:

> The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.

473 U.S. at 496 n. 14, 105 S.Ct. at 3285–86 n. 14 (quoting, with emphasis added, S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). According to Kaplan, the Citisource bribes cannot constitute a pattern of racketeering activity because they arose from a single conversation with Lindenauer and were accordingly an "isolated incident" of "unitary character" lacking the "continuity" to which the footnote in *Sedima* referred.

Our full court has, however, on its own motion granted rehearing in banc in *United States v. Indelicato*, Nos. 87–1085, 87–1215 (2d Cir. argued June 13, 1988), to address a contention substantially similar to Kaplan's. Since the panel has found Kaplan's other claims regarding his RICO convictions to be without merit, *see supra* Parts A(2), C(1); *infra* Part D(1), we will reserve our decision on whether Kaplan's RICO convictions should stand until *Indelicato* is decided.

### D. *The District Court's Evidentiary Rulings*

We now turn to several challenges by Kaplan and Friedman to the district court's evidentiary rulings. Kaplan contends that Judge Knapp erred when he admitted the testimony of Joseph Delario and two other Datacom executives, whose immunity agreements Kaplan claims constituted an

invitation to perjury. Kaplan also argues that the district court should have excluded the testimony of the Datacom witnesses under Fed.R.Evid. 615 because two of the witnesses had read daily transcripts of the trial proceedings before agreeing to cooperate with the government. In turn, Friedman contends that the district court erred by refusing to admit evidence that Donald Manes had lied about his January 1986 suicide attempt. Friedman also argues that the district court should have allowed him to subpoena Geoffrey Lindenauer's psychiatric records. We address these contentions seriatim.

### 1. *Kaplan: The Datacom Witnesses*

(a) *The Immunity Agreements.* Three Datacom executives—Joseph Delario, Neal Anderson and Robert Sargenti—testified for the government under grants of use immunity. The offers of immunity were made during the sixth week of the trial, after Lindenauer had testified and shortly before the government was scheduled to rest its case. The offers of immunity were contingent upon proffers of testimony that the government deemed truthful. Delario and Anderson had already testified before federal grand juries in three districts and had consistently denied that either they or Datacom had engaged in any wrongdoing. The government regarded this grand jury testimony as perjurious. At trial, the Datacom witnesses testified, among other things, as to how Kaplan had helped Delario bribe both Manes and Lindenauer in order to obtain a data-processing contract for Datacom.

■ Kaplan contends that the offer of immunity was "so coercive that it effectively rendered the [Datacom] witnesses unable to testify truthfully." He argues that the immunity agreements effectively protected the Datacom witnesses from the potential forfeiture of millions of dollars in a subsequent RICO prosecution. In Kaplan's view, the immunity agreements amounted to a huge contingency fee, and the resulting testimony thus constituted a denial of due process. The government contends that the effect of any immunity

agreement or fee arrangement or testimony is an issue to be decided exclusively by a properly instructed jury. Our caselaw supports the government.

■ Even if the immunity agreements in this case are assumed to be as coercive as a contingency-fee arrangement, the testimony of the Datacom witnesses would not be inadmissible. *United States v. Persico*, 832 F.2d 705, 716–17 (2d Cir.1987), a case decided after the argument of these appeals, involved a witness who was promised a payment in an amount to be determined after the government's evaluation of the "overall quality" of cases brought as the result of that information and testimony provided by the witness. Like Kaplan, the appellants in *Persico* relied upon a now-overruled line of Fifth Circuit cases holding that, in certain narrow circumstances, contingency-fee arrangements violate due process. *See, e.g., Williamson v. United States*, 311 F.2d 441 (5th Cir.1962), *overruled in United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir.1987) (en banc) (decided August 21, 1987, after main briefs had been filed but before argument in this case), *cert. denied,* —— U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). In *Persico*, we expressed our "confidence in the jury's ability to assess counsels' arguments about the inherent unreliability of 'purchased' testimony, and to evaluate the witness' credibility accordingly." 832 F.2d at 717. We therefore held that "the credibility of the compensated witness, like that of the witness promised a reduced sentence, is for a properly instructed jury to determine." *Id.* (quoting *Cervantes–Pacheco*, 826 F.2d at 316).

■ Under our decisions, therefore, the question is whether the circumstances surrounding the agreements were aired before the jury, and whether the court gave proper instructions regarding the immunized witnesses' testimony. Here, through both direct and cross-examination of the Datacom executives, the jury learned in exhaustive detail about the witnesses' agreements with the government and about the potential financial ramifications of those agreements. In addition, defense counsel in

their summations sharply challenged the credibility of the Datacom witnesses. As to the jury instructions, Kaplan contends that the district court did not give the jury sufficient guidance with respect to the immunity agreements. However, the careful and lengthy instruction given by Judge Knapp, set forth in the margin,[7] more than adequately advised the jury of the possible incentives created by the immunity agreements.

■■■ (b) *The Reading of the Trial Transcripts.* Kaplan also contends that the testimony of the Datacom witnesses should have been excluded under Fed.R. Evid. 615 because Delario and Anderson had read portions of the trial transcript prior to agreeing to cooperate with the government. This argument is meritless. Although the reading of testimony may violate an order excluding witnesses issued by a district court under Rule 615, *see, e.g., Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1373 (5th Cir. July 1981) (reading of testimony may be more harmful than watching it because reading enables witness to "thoroughly review and study [previous testimony] in formulating his own"), the exclusion of testimony is " 'a serious sanction,' appropriate only where 'the defendants have suffered actual prejudice, and there has been connivance by the witness or counsel to violate the rule.' " *United States v. Jimenez,* 780 F.2d 975, 980 (11th Cir.1986) (per curiam) (quoting *United States v. Blasco,* 702 F.2d 1315, 1327 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983)). The decision whether or not to exclude testimony, moreover, is within the sound discretion of the trial judge. *See, e.g., United States v. Thomas,* 774 F.2d 807, 810 (7th Cir.1985), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1218, 89 L.Ed.2d 329 (1986). Because the government did not cause the Datacom witnesses to read the trial transcripts, and because the whole episode was revealed to the jury in defense counsel's attacks on the witnesses' credibility—*e.g.,* counsel for Friedman, referring to Delario's testimony in summation: "Did you hear that before? Does that have a certain ring to it? It has the ring of Geoffrey Lindenauer on the

---

7. The court's charge on the testimony of accomplices states in part:

[T]he law imposes upon you stringent requirements as to how to evaluate [accomplice] testimony before concluding it to be reliable. Obviously, it's much more pleasant to be a witness than a defendant. The law requires that you scrupulously examine an accomplice's motives in persuading the Government to accept him as a witness rather than prosecuting him as a defendant. So, you can be sure that he's neither made up a story to incriminate someone nor colored the facts of an otherwise true story to make someone appear to be more guilty than he actually is.

*I'm going to discuss with you in some detail the testimony of the Witness Lindenauer, not because I think his testimony is more important than any other witness—that is a question wholly within your province to determine—but simply because all attorneys in the case spent so much time on this particular aspect of his testimony that it lends itself to illustrating the principles involved.*

In the first place, Lindenauer told you that he had lived a life characterized by acts of wrongdoing, many of which involved deception. This is obviously a factor you will take into account in determining the reliability of his testimony.

In the second place, he was able to negotiate a plea which considerably reduced the total scope of the sentence that might have been imposed upon him had he been convicted of all his wrongdoings.

And finally, he hopes, as he specifically told you, that the testimony he gave in this case will induce the judge before whom he pled guilty to be lenient in imposing sentence.

These circumstances could have affected Lindenauer in at least three possible ways. *They could have caused him to make up imaginary facts in order to incriminate some or all of the defendants, or they could have caused him to color existing facts to make them appear to be more incriminating than they actually were.* Or, on the other hand, they might have caused him to conclude that his best hopes of salvation was to be able to convince the judge who ultimately sentences him that he was scrupulously honest in his testimony before you.

You should take account of these and any other possibilities that might occur to you in evaluating his testimony.

*The foregoing principles apply in varying degrees to all so-called accomplice witnesses. Some face sentences and some testified under grants of various types of immunity, which greatly reduced the possibility of their ever being prosecuted. They all, in one way or another, could conceive it to be in their own best interest to achieve and retain the good will of the government.*

pages of the transcript that Mr. Delario so dutifully read."—we find no abuse of discretion in Judge Knapp's refusal to exclude their testimony.

### 2. *Friedman: The Impeachment of Manes*

■ Friedman's primary contention on appeal concerns the district court's refusal to allow the introduction of evidence that Donald Manes had lied to law-enforcement authorities about his attempt in January 1986 to take his own life. Because Lindenauer testified to numerous hearsay statements by Manes admitted as declarations of a co-conspirator in furtherance of the conspiracy under Fed.R.Evid. 801(d)(2)(E), Friedman argues that the exclusion of this evidence violated Fed.R.Evid. 806, which authorizes the introduction of evidence attacking the credibility of a hearsay declarant. We believe the evidence was properly excluded because it was simply not probative on the issue of the credibility of Manes's conspiratorial statements to Lindenauer.

In the early morning hours of January 10, 1986, aware that federal authorities were investigating his dealings with the PVB, Donald Manes was seen driving erratically on the Grand Central Parkway by police officers. Bleeding from slash wounds in his left wrist and left ankle, Manes was taken to a hospital in Flushing. While at that hospital, the Queens Borough President explained his wounds by telling investigators that two men hiding in the rear seat of his automobile had abducted him when he left Queens Borough Hall on the evening of January 9. On January 21, however, after having been transferred to a hospital in Manhattan, Manes read to reporters at his bedside a short statement in which he admitted that his wounds were self-inflicted and that he had fabricated the story of his abduction.

At trial, Friedman sought to impeach the credibility of the late Manes's hearsay declarations by presenting evidence of this false story. Specifically, Friedman offered the testimony of a Queens County assistant district attorney to whom Manes had lied, along with a videotape of Manes reading his public statement.

The district court excluded the proffered evidence because it had no probative value and might confuse the jury. *See* Fed.R. Evid. 403 (relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"). The district judge announced that "I don't see what [Manes's abduction story] has to do with this case," and pointed to the fact that, when the jury was being selected, he had asked each prospective juror to "accept my representation that Manes' suicide has nothing whatever to do with this case."

Rule 806 of the Federal Rules of Evidence provides that "[w]hen a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806. As the Advisory Committee's Note explains, "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified. See Rules 608 and 609." *Id.* advisory committee's note. In turn, under Rule 608(b), "[s]pecific instances of the conduct of a witness ... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness." Fed.R.Evid. 608(b). Friedman argues that the district court was required to admit evidence of Manes's false abduction story because Manes could have been cross-examined on the subject under Rule 608(b) if he had lived to testify at the trial. Specifically, Friedman emphasizes that, had Manes testified, defense counsel could have sharply attacked the Queens Borough President's credibility by asking him "questions about his criminally mendacious attempt to shift the responsi-

bility to others for his self-inflicted wounds."

Rule 806 does not set forth a test of probative value but rather states generally the type of evidence that may be used to undermine hearsay declarations.[8] Specific issues of whether a declarant's past conduct may actually "cast doubt on the credibility of [his] statements," *United States v. Serna*, 799 F.2d 842, 850 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987), must be determined by comparing the circumstances of the past conduct with those surrounding the hearsay statements admitted into evidence. Such assessments, like determinations of relevance and rulings as to the proper scope of cross-examination, must be left to the "broad discretion" of the trial judge, "and we will not overturn an exercise of that discretion absent a clear showing of abuse." *United States v. Bari*, 750 F.2d 1169, 1178 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Judge Knapp certainly did not abuse his discretion here. The evidence of Manes's false abduction story had no conceivable bearing upon the credibility of his statements to Lindenauer in furtherance of the conspiracy. When Manes was found badly wounded on that early January morning, he was a distraught man whose life was soon to be shattered by the government's investigation. Lindenauer thus testified that, as the investigation closed in around them, an uncharacteristically "nervous" and "erratic" Manes had suggested to Lindenauer the possibility of suicide to avoid prosecution. Manes's false account of his suicide attempt was obviously intended to conceal his consciousness of guilt in the face of the ongoing investigation. To suggest, as does Friedman, that this pathetic incident demonstrates that Manes as a general matter "falsely blamed others for causing his wounds"—as if Manes had specifically accused someone as an abductor in his false explanation of his wounds—is fanciful. There is simply no merit to the suggestion that the incident casts doubt upon the credibility of Manes's conspiratorial declarations. Those statements, which were in furtherance of the conspiracy, were not attempts to shift blame from Manes to others but directly implicated him as well as the others. Admission of the testimony and videotape, moreover, would necessarily have injected Manes's subsequent suicide into the heart of the case as evidence of the guilty state of mind that caused him to lie on the earlier occasion. There was thus no error in its exclusion.

We note as well that Judge Knapp was not insensitive to the commands of Rule 806. He thus properly allowed Friedman to introduce evidence attacking the credibility of a statement that Manes had made to Lindenauer thirteen years earlier about the source of the $25,000 Manes had invested in Lindenauer's psychotherapy clinic. Friedman claims that this evidentiary ruling is inconsistent with the ruling on the abduction story because the psychotherapy-clinic episode was more remote in time. The two rulings are entirely consistent, however, because the evidence concerning the $25,000 payment, unlike the evidence about Manes's suicide attempt, directly involved the credibility of Manes's out-of-court statements to Lindenauer.

3. *Friedman: Lindenauer's Psychiatric Records*

■ The late Borough President's importance at trial stemmed not so much from what he said as from what he did, while Lindenauer's credibility was at the heart of the verdicts. Friedman accordingly contends that the district court committed reversible error when it quashed trial

---

8. The government does not argue, as it did below, that the Manes videotape was inadmissible under Rule 806 as the result of Rule 608(b)'s provision that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." Fed.

R.Evid. 608(b). That rule limits such evidence of "specific instances" to cross-examination. Rule 806 applies, of course, when the declarant has not testified and there has by definition been no cross-examination, and resort to extrinsic evidence may be the only means of presenting such evidence to the jury.

subpoenas issued to two psychiatrists who had treated Lindenauer. Again, we disagree.

On June 2, 1986, Friedman issued trial subpoenas pursuant to Fed.R.Crim.P. 17(c) to Herbert Kalmanoff, M.D., and John Diamond, M.D., directing them to produce "[a]ll medical and psychiatric records relating to Geoffrey Lindenauer." Lindenauer immediately intervened and moved to quash the subpoenas on the ground that they violated the psychotherapist-patient privilege. The district court thereupon conducted an examination in camera of materials produced by Dr. Kalmanoff. These included a letter of recommendation written by Dr. Kalmanoff on behalf of Lindenauer and Dr. Kalmanoff's handwritten notes of his psychotherapy sessions with Lindenauer held between November 1970 and January 1984. After inspecting the documents, the district court granted Lindenauer's motion to quash with respect to Dr. Kalmanoff's notes on the ground that they were privileged. *United States v. Friedman*, 636 F.Supp. 462 (S.D.N.Y. 1986). Relying upon his examination of the notes and upon our decision in *In re Doe*, 711 F.2d 1187, 1193–94 (2d Cir.1983), Judge Knapp concluded that

> the material here subpoenaed contains the type of intensely personal communications that the psychotherapist-patient privilege is designed to protect. The notes contain extremely personal statements made by the patient, recollections of past experiences, notes of dreams, as well as observations of the patient by the doctor. It is clear that a real, lasting and professional psychotherapist-patient relationship existed between Lindenauer and his doctor. Further, unlike [*United States v.*] *Lindstrom*, [698 F.2d 1154 (11th Cir.1983),] nothing in our investigation of these materials suggests to us any impediment to Lindenauer's ability to know, comprehend and relate the truth.

636 F.Supp. at 463.

Having ourselves examined Dr. Kalmanoff's notes under seal, we agree with Judge Knapp that a true psychotherapist-patient relationship existed and that nothing in the psychotherapist's notes casts any doubt upon Lindenauer's ability to understand and relate the truth. We need not, however, address either Judge Knapp's conclusion that the notes were privileged or the broader question left open in *Doe*, namely whether we should recognize a psychotherapist-patient privilege. We are confident that even if the Kalmanoff notes were not privileged and the quashing of the subpoena was error, the error was harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). The notes contain little, if any, material that would have been useful in cross-examining Lindenauer. Indeed, Judge Knapp also found that he would not have permitted use of the notes at trial "regardless of any claim of privilege." 636 F.Supp. at 462.

Moreover, whether or not the notes were relevant, if admitted, they could not have had even a marginal impact upon the jury's assessment of Lindenauer's credibility. In particular, Lindenauer's guilty plea and the pendency of his sentencing were brought out on direct examination. Defense counsel also cross-examined Lindenauer on numerous acts of dishonesty he had committed that were completely unrelated to his crimes at the PVB. Lindenauer was asked, for example, about his purchase of two fraudulent graduate degrees, about his operation of a sham psychotherapy clinic, about his having sexual relations with patients at that clinic, and about whether negative publicity surrounding sexual practices at his sham clinic had resulted in its closing. Thus, "[i]f [Lindenauer] was an otherwise unimpeached witness, [his] psychiatric history might have been of some value to the defense other than as a legal point to be preserved for an appeal, but he wasn't and it isn't." *United States v. Bari*, 750 F.2d at 1179. In addition, however unsavory Lindenauer might have appeared to the jury, his story on the witness stand was corroborated in many important respects by other witnesses, including Joseph Delario, Robert Richards and Dr. Jerome Driesen. Accordingly, any error in

quashing the subpoena of Lindenauer's psychiatric records was harmless.

### E. *Friedman's Ineffective Assistance Claim*

We turn next to Friedman's claim that he was denied his sixth amendment right to the effective assistance of counsel. Friedman contends that his trial counsel, Thomas P. Puccio, "sidestepped crucial lines of cross examination" because of conflicts of interest resulting from Puccio's representation of Robert Richards, an indicted conspirator, from his representation of Melvin Lebetkin, an unindicted conspirator, and from his alleged representation of a third person, a lawyer named Harold Borg. We conclude that Friedman knowingly waived the first alleged conflict and that the other two alleged conflicts were not conflicts at all.

#### 1. *Richards and Lebetkin*

Robert Richards, formerly president of Citisource, testified for the government at trial. Before he agreed to cooperate with the government and when he gave testimony before the SEC materially different from his testimony at trial, both Richards and Citisource had been represented by Puccio and Puccio's law firm, Stroock & Stroock & Lavan.

Citing our decision in *United States v. Iorizzo*, 786 F.2d 52 (2d Cir.1986), and realizing that any conviction it might obtain against Friedman would be at risk, the government moved on May 8, 1986 to disqualify Puccio. The government's motion stated that Richards had pleaded guilty to federal bribery charges and was expected to testify at trial. The motion also set forth relevant facts concerning Puccio's previous representation of Richards and stated that Puccio had also represented Melvin Lebetkin, an attorney who was being investigated for allegedly paying bribes to Manes and Lindenauer on behalf of yet another PVB vendor, the Standard Collection Agency. In a sealed affidavit, the government stated that Puccio had attempted to gain immunity for Lebetkin by proffering testimony. No such agreement,

however, had been reached, although the government stated that it had continued to express an interest in obtaining one. The government speculated that Lebetkin's testimony would harm Friedman by tending to corroborate Lindenauer's testimony regarding Manes.

Friedman vigorously opposed the government's disqualification motion. In an opposing affidavit, Puccio questioned the government's good faith in filing the motion, suggesting that it was merely an attempt to delay the trial. Puccio emphasized that the Stroock firm had represented Richards in its role as corporate counsel to Citisource, and that "[a]t no time did I confer privately with Mr. Richards or provide him personally with legal advice." Puccio's affidavit also pointed out that when the New York County District Attorney had announced on February 18, 1986 that several officers of Citisource, including Richards, were targets of investigation, Puccio had immediately recommended that each of the Citisource officers obtain independent counsel. Puccio stated as well that there was "no realistic possibility that I would be either a sworn or unsworn witness at the trial." With respect to Lebetkin, Puccio stated that Lebetkin's and Friedman's "respective relationships with Lindenauer are totally distinct from one another," and that accordingly no conflict of interest existed.

Friedman himself submitted an affidavit in opposition to the government's motion. It stated:

STANLEY M. FRIEDMAN, being duly sworn, deposes and says:

1. I am a member of the bar of this Court and a defendant in this criminal proceeding which has been scheduled for trial before this Court on or about June 2, 1986.

2. In January of this year, I retained Thomas P. Puccio, Esq. to represent me in connection with criminal investigations undertaken by the District Attorney of New York County and the United States Attorney for the Southern District of New York.

3. Since January 1986, I have spent hundreds of hours with Mr. Puccio discussing this case; I have paid to Mr. Puccio substantial legal fees; I have the fullest confidence in Mr. Puccio's ability to represent me; I enjoy an excellent client-attorney relationship with Mr. Puccio. In light of the foregoing, I believe that not to be able to continue in this case with Mr. Puccio as my attorney would cause me irreparable harm. Furthermore, I would lose my right to a speedy trial.

4. I have read the conflict charges submitted by the United States Attorney against Mr. Puccio. I have also read Mr. Puccio's affidavit in opposition, and related documents, including the May 8, 1986 Transcript of Proceedings before this Court.

5. In addition thereto, I have obtained the advice of independent counsel (although I, too, am a practicing attorney) who concurs with me that there is no conflict of interest in Mr. Puccio continuing to represent me. However, if the government's position is correct, I waive the benefit of any purported conflict.

WHEREFORE, based on the foregoing, I respectfully request that this Court deny the government's motion to disqualify my attorney, Thomas P. Puccio.

The district court conducted a hearing on the disqualification motion, at which the court asked both Puccio and Friedman their views on the matter:

THE COURT: Do you stipulate that you will not—

MR. PUCCIO: Cross-examine him on that point?

THE COURT: Cross-examine him in any way to bring out the fact that he testified inconsistently before the SEC.

MR. PUCCIO: Yes, I will stipulate. I have no problem with that.

THE COURT: Does Mr. Friedman agree to that?

DEFENDANT FRIEDMAN: Yes, your Honor, I agree with Mr. Puccio's position on the cross-examination of Mr. Richards.

MR. ROTH [for the government]: If I could interject for a moment? Assuming we are going to try a waiver, [*United States v.*] *Curc[i]o*[,] [680 F.2d 881 (2d Cir.1982),] set out very explicit procedures for that.

THE COURT: *Curcio* wasn't talking about a defendant who was a lawyer and a waiver which, as I said before, if it wasn't made Mr. Puccio shouldn't be disqualified. Anybody representing Mr. Friedman who brought up this SEC testimony in light of what you said you would do when it was brought up would be a certified idiot. So I don't have to have Mr. Friedman, who is a lawyer, consult another lawyer to find out whether it is all right not to have his lawyer be a certified idiot.

The court denied the government's motion on May 21.

Friedman, who once served as an Assistant District Attorney for Bronx County, now claims that he did not validly waive any conflict of interest arising from Stroock's representation of Richards. Specifically, Friedman contends that his waiver did not meet the standards set forth by this court in *United States v. Iorizzo*, 786 F.2d at 59, and *United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir.1982), and that his background as a lawyer is irrelevant to the determination of whether his waiver was "knowing and intelligent." We disagree.

In *Curcio*, we established procedures to be followed by trial courts in determining whether a criminal defendant has knowingly and intelligently chosen to waive his right to be represented by an attorney who is free from conflicts of interest. We noted that the "first task of the trial court is to alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit." *Id.* at 888. We stated that the court must then "assess whether the [defendant's] request is ... knowing and intelligent," *id.*, and that "the court may perhaps devise a variety of methods for gaining the necessary insights." *Id.* at 889. Nevertheless, analogizing to Fed.R.Crim.P. 11, we observed that "questions designed to elicit from the

defendant a narrative statement of his understanding are preferable to questions designed to elicit mere 'yes' or 'no' answers." *Id.* We also noted that "the court's inquiry in each instance should take place after the defendant[ ] ha[s] had a reasonable time to digest and contemplate the risks posed by [the conflict of interest.]" *Id.*

Though we described our decision in *Curcio* as "prescrib[ing] [a] catechism," *id.* at 890, we nevertheless recognized that the existence of a knowing and intelligent waiver "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused,'" *id.* at 888 (quoting *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (citations omitted)). Under the circumstances of Friedman's case, we have little difficulty in finding a knowing and intelligent waiver despite the departure from the full-blown *Curcio* catechism. First, Friedman had ample time and opportunity to "digest and contemplate" the risk posed by his continued representation by Puccio. The government's disqualification motion was filed nearly a week before the hearing was conducted. Friedman thus was not, like the defendants in *Curcio,* forced into a snap decision during a lunch break, *see id.* at 889, or like the defendant in *Iorizzo,* compelled to make a choice "on the spot" in the middle of a trial. 786 F.2d at 59; *see id.* at 55–57. Second, Friedman's affidavit stated that he had read the government's submissions and Puccio's response and that he had consulted with independent counsel. He had thus clearly been alerted to the substance of the dangers of representation by Puccio. Finally, Friedman was a lawyer who had already devoted "hundreds of hours" to the preparation of his defense. We therefore conclude without difficulty that his waiver was knowing and intelligent. We emphasize, however, that departures from the procedures outlined in *Curcio* and *Iorizzo* may be justified only in unusual circumstances, such as those in the instant case.

With respect to the alleged conflict of interest involving Puccio's representation of Lebetkin, Friedman contends that Puccio cross-examined Lindenauer "in a truncated fashion" and declined any cross-examination of Sandow in order to avoid the possibility that either witness might give public testimony incriminating Lebetkin. Puccio, however, did ask Lindenauer about the amount of the bribes he received from Lebetkin's firm, Standard Collection Agency. Although Friedman notes accusingly that Puccio "mention[ed] Lebetkin's company only in passing and never mention[ed] Lebetkin himelf," we fail to perceive, and Friedman fails to explain, what purpose any further questioning about the subject would have served. The questions about Standard Collection Agency were relevant only to show Lindenauer's propensity to take bribes and to test Lindenauer's memory of corrupt transactions. Puccio's representation of Lebetkin could not have affected other aspects of Puccio's cross-examination of Lindenauer.

As to Puccio's failure to cross-examine Sandow, Sandow's testimony did not incriminate Friedman and mentioned him only in passing. Sandow's testimony primarily concerned Shafran, and thus only Shafran's lawyer bothered to cross-examine. Moreover, very little of Shafran's cross-examination of Sandow concerned Sandow's dealings with Lebetkin. In view of the marginal relevance of Lebetkin and Standard Collection Agency to this case, let alone to Friedman's guilt, we fully agree with Puccio's original assessment that "a lawyer representing both [Lebetkin and Friedman] would not be required at a joint trial to take contradictory positions in defending both of them." In sum, with respect to Puccio's representation of Lebetkin, Friedman has failed to show either an "actual conflict of interest," *Cuyler v. Sullivan,* 446 U.S. 335, 349, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), or a "lapse in representation," *Iorizzo,* 786 F.2d at 58 (quoting *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1708), that together would constitute a denial of his sixth amendment rights.

## 2. *Borg and the Driesen Tape*

▮ Friedman's last claim of ineffective assistance arises out of a curious incident. One week before opening arguments at the trial, the government revealed to the district court and to Friedman that one of its witnesses, Dr. Jerome Driesen, had surreptitiously tape-recorded a meeting attended by Puccio and another attorney, Harold Borg, on June 3, 1986. Dreisen, who at the time of the June meeting was cooperating with federal authorities, engineered the recording with the assistance of the FBI. According to the government, the meeting had been arranged after Borg had offered to help Driesen obtain secret information about an investigation being conducted by a Queens County grand jury. According to Puccio, the meeting had been arranged because Puccio, who needed material with which to impeach Lindenauer, had been told that Driesen, a forensic psychiatrist and long-time friend (and accomplice) of Lindenauer, believed that Lindenauer was mentally imbalanced.

At the recorded meeting, Puccio and Borg attempted to persuade Driesen that it was in Dreisen's interest to provide Puccio with information impeaching Lindenauer. They told Driesen that they had heard that, as the result of Lindenauer's testimony, Driesen had been named in a sealed indictment by the Queens grand jury. Though he feigned ignorance, Driesen, who had signed a cooperation agreement with the Queens County District Attorney, already knew that he had been indicted. Borg and Puccio argued that the Queens County indictment might never be unsealed if federal prosecutors were unsuccessful in building the instant case around Lindenauer. Puccio accordingly asked Driesen throughout the meeting whether Lindenauer had "severe emotional problems" and whether Driesen knew other things that might help Puccio undermine Lindenauer on the witness stand.

Each time the topic of discussion turned to Lindenauer, however, Driesen—who had been instructed by the FBI not to discuss either Lindenauer or the *Friedman* case with Puccio—would change the subject, otherwise act unresponsively, or give Puccio answers that were inconsistent with the testimony he later gave at trial. For example, at several points during the meeting, Driesen would avoid discussing Lindenauer by asking Borg and Puccio whether it would be possible to obtain firmer information about the Queens County investigation. At other points, Driesen would answer inquiries about Lindenauer with responses such as "You're asking me to what? I, uh, to say that he has severe emotional problems?" and "I don't know what it is you want me to say about Lindenauer." At one point, in response to a direct question from Puccio, Driesen denied having any connection with Lindenauer's and Manes's attempt to acquire an ownership interest in a psychiatric hospital in Queens through extortion. At trial, Driesen testified to the contrary, and stated that he had pleaded guilty to state misdemeanor charges in connection with the scheme. At least twice during the meeting, Puccio stated that all he wanted was to know the truth about Lindenauer. Puccio also asked Driesen if the room in which they were meeting, Driesen's office, was bugged.

Toward the end of the meeting, after Borg had pulled Driesen aside, Driesen told Borg:

> What? Look who's talking. Look, listen to me for a second HAROLD, just lemme talk for one second. Uh, my feeling is, my feeling is that he [presumably Puccio] wants me to say things that are uh, that are not true, and I am uh, I don't know if this whole thing isn't bullshit, I don't know if the whole thing is bullshit HAROLD, I, don't [unintelligible] get me, tell me, questions, give me the questions, give me the answers, give me the uh, uh, what does an indictment have, it has numbers on it, gimme the numbers of the indictment, show me something that is true, HAROLD, because this is bullshit. I think that I'm being, how do I know that I'm not just being scared by him to make his case?

After an unintelligible response from Borg, the FBI's tape reveals that Driesen then asked Borg: "[W]hat does he want me to say?" According to the transcript, Borg's

reply was: "[unintelligible] not interested in that right now." And the last portion of the transcript of the tape reads as follows:

HB [Borg]: Who's the [unintelligible]

JD [Driesen]: What, yeah, bugged. Goodnight.

(BACKGROUND NOISES).

JD: Who is it?

(BACKGROUND NOISES).

JD: You see, you see two tricky guys playing chess? You see, uh, lemme shut everything off, lemme shut this off.

KS: This is Special Agent KEN ST. GERMAIN, the sound that [unintelligible]

JD: That's uh, running. Put it off, it's running. I think it's got a pause button.

KS: [unintelligible]

JD: I don't, anybody ...

KS: [unintelligible]

KS: The time is now 11:14 P.M., June 3, 1986, and I'm going to deactiviate this recorder.

JD: [unintelligible] Whoever said he's not a sharp guy, PUCCIO, uh, did you, did you see us pussyfooting in there?

KS: Yeah.

JD: What does he want me to say? And, you know, he wants me to say he's crazy?

(END OF CONVERSATION).

At the September 24 hearing, which was held in camera, Puccio expressed his outrage at his having been taped by the government. He accused the government of having "tried to set me up," an understandable reaction in light of the fact that some of Driesen's responses might readily be interpreted as inviting Puccio to suborn perjury. The United States Attorney, Rudolph W. Giuliani, denied this accusation, claiming that "[t]he subject of this investigation was Mr. Borg, not Mr. Puccio." Giuliani claimed that the government had been investigating Borg for obstruction of justice and had been also seeking to determine how Borg had acquired secret information about the state grand jury testimony of the government's star witness, Lindenauer. Puccio, however, stated that Driesen's indictment had been leaked to the press by the Queens District Attorney and

was all but common knowledge. Giuliani further stated that although

there was a period of time in which Mr. Borg was representing that Mr. Puccio could do things which under one interpretation could be considered to be improper or criminal[,] [w]hen we reviewed that tape we came to the conclusion that there was no such conduct, and closed, even if you want to call it that, any investigation of Mr. Puccio. And that's months ago.

Giuliani explained that the government had revealed the existence of the tape because Driesen might be called to testify, and that while "[w]e don't think it bears on the trial [or is] relevant to cross-examination," the government thought it would be "fair for [Puccio] to know [about the tape] when he cross-examines Mr. Driesden [sic]." Judge Knapp expressed his view that the tape was irrelevant to the trial. After Puccio vowed that he would complain to the Director of the FBI, the matter was seemingly dropped.

The tape recording surfaced once again as an issue during trial, however, on October 23, the day before Driesen originally was scheduled to testify. Puccio expressed the view that if Driesen's credibility were brought into question, Friedman should be allowed to present evidence that Driesen had lied during the recorded meeting when asked about Lindenauer and the instant case. But because Puccio, as a witness to that meeting, could not "bring that out," Puccio argued that Driesen's testimony should be excluded in light of the government's failure to try to disqualify Puccio once it had decided to use Driesen's testimony. *See, e.g., United States v. McKeon,* 738 F.2d 26, 34-35 (2d Cir.1984); *United States v. Cunningham,* 672 F.2d 1064, 1074-75 (2d Cir.1982). Giuliani responded by arguing that Driesen "wasn't lying.... He was doing precisely what he was instructed to do by the FBI, which was not to get into discussions about Geoffrey Lindenauer or the case." Giuliani also stated shortly thereafter that Driesen "lied in the sense he was a cover, undercover agent, [in] the way an undercover agent is instructed to lie," but that "of course we

didn't" instruct Driesen to lie. Judge Knapp concluded that even if Driesen "would lie in that situation," that fact would have at most a "piddling" impact upon Driesen's credibility.

On October 28, 1986, just before Driesen took the stand, Puccio again argued vigorously for the exclusion of Driesen's testimony on the ground that the recorded conversation constituted valuable impeachment evidence that Friedman could not use. In particular, Puccio speculated that Driesen, for reasons of his own, had "lied to them [the government] when he said that Harold Borg was going to supply him or talked about supplying him with Grand Jury material." The district court, however, rejected Puccio's arguments, observing that the Driesen tape "doesn't strike me ... as very persuasive impeachment." The court added that "I think you would be foolish to bring it out.... But you made a beautiful record."

From these curious facts now comes a curious appellate claim: In a convoluted attempt to invoke our decision in *United States v. Iorizzo*, Friedman asserts that Puccio may have been representing Borg while representing Friedman during the trial in this case. According to an affidavit filed by Friedman in the district court in conjunction with a motion subsequent to this appeal for a new trial, Puccio had represented Borg in a criminal investigation at one time. Whether that representation continued through the trial of the instant matter is not clear.

However, even assuming that Puccio had represented Borg at the pertinent time, and that cross-examination of Driesen with regard to the June 3 meeting would have been adverse to Borg's interests (an heroic assumption), we fail to perceive a conflict of interest. Specifically, we fail to see either (1) how the taped meeting could have been used to bolster Friedman's defense or (2) how the existence of the tape or of the taped meeting itself could have affected Puccio's conduct of that defense. Any attempt to use the Driesen tape was obviously fraught with risk for Friedman and would have surely been, as Judge Knapp

put it, "foolish." Driesen's credibility would not have been damaged by evidence of dissembling when he was operating under the FBI's instructions. Instead, cross-examination of Driesen about the events of June 3 would likely have done nothing except bring to the jury's attention the fact that the government had at one point decided to investigate Friedman's lawyer. If that fact would have had any effect on the jury, it probably would have prejudiced the defense.

Moreover, even the most cursory examination of the record reveals a much sounder reason for Puccio's failure to cross-examine Driesen than a supposed conflict of interest. Cross-examination was unnecessary. A number of far more cogent impeaching facts were elicited by the United States Attorney in his direct examination of Driesen. Specifically, Driesen had pleaded guilty to federal and state charges relating to his friendship with Lindenauer. He had in the recent past habitually used cocaine. He had also served as the psychiatric consultant to Lindenauer's sham clinic and had allowed Lindenauer, whom he knew held only a phony Ph.D., to use his office to treat patients. In addition, Driesen's testimony, which largely recounted conversations with Lindenauer about Manes, was cumulative. All defense counsel thus simply made light of Driesen's testimony by not even bothering to question him. Accordingly, we conclude that the Driesen tape would have been of no use to Friedman's defense, and that there was thus neither an actual conflict of interest nor a lapse in Puccio's representation of Friedman.

## F. *The District Court's Publicly Reported Assessment of Friedman's Credibility*

Friedman's next claim concerns another unusual incident, one that occurred in Judge Knapp's robing room during the seventh week of trial. This incident involves a publicly reported comment made by the district judge about Friedman's testimony. Friedman claims that the judge's comment requires either dismissal of the indictment

or a new trial. This claim is both waived and meritless.

On the morning of November 11, 1986, Friedman took the witness stand in his own defense. After denying all of the government's charges against him, he testified at length about his career as a lawyer and a politician, emphasizing, for example, his continuing membership in the Democratic National Committee and his reelection during the week before trial as Chairman of the Bronx County Democratic Committee. In addition, Friedman testified that, among other things, he had represented the Kaplan Group in connection with its attempt to obtain and fulfill a PVB contract to develop a hand-held computerized device that would issue parking tickets. While admitting that Kaplan had given him three 50,000–share blocks of stock in Citisource, Friedman claimed that he had intended to give two of the blocks to his children, but had decided not to put the stock in his children's names because he believed that others might conclude he was attempting to conceal his own ownership.

 The government's cross-examination of Friedman began late in the afternoon but was interrupted when defense counsel objected to the government's attempt to cross-examine Friedman about his representation of clients before City agencies (other than the PVB) in which he held patronage power. The haggling over the scope of cross-examination continued the next morning in Judge Knapp's chambers. The government argued that Friedman's lobbying efforts constituted extortion and were relevant to impeaching Friedman's claim that he was an honest politician. *See* Fed.R.Evid. 608(b). Defense counsel argued that evidence of Friedman's lobbying efforts was irrelevant and prejudicial. After extensive discussion, Puccio asked the district court to defer its decision on the scope of cross-examination. The following colloquy took place:

> [MR. PUCCIO]: Judge, can I make a suggestion? Why—could you ask the United States Attorney to question him about the case here first, and then after that,

make this decision? I think that's a fairer way.
>
> THE COURT: What's this?
>
> MR. PUCCIO: Could you request that the United States Attorney defer this and question him about what's involved here? Maybe you'll decide after that he doesn't need all this.
>
> THE COURT: I can't tell the United States Attorney how to try the case. I know how I would if I were doing this. I wouldn't do all this bullshit.
>
> MR. PUCCIO: If you wouldn't do all this bullshit, I don't think you should permit him to do it.
>
> THE COURT: I'm not trying the case. I wouldn't do it because I think it's illegal. I think it's a waste of God damn time.
>
> MR. PUCCIO: I think's its highly prejudicial to my client.
>
> THE COURT: *With the highly improbable story that your client told, I think that should be what we're talking about, not this bullshit. But that's neither here nor there.*

(emphasis added).

Representatives of the press attending the session in the robing room heard this remark as it was made. After Puccio expressed concern about the comment, Judge Knapp asked the media representatives who were present to refrain from reporting it, stating:

> I can't ask you to make any commitment to me. That's way beyond my province. I point out I think it would be very unfortunate and very unfair to Mr. Friedman if that should bet [sic]—just as it was unfair to the Government—to have that newspaper account that said I said that Lindenauer is a liar, which I didn't say. But I'm not so concerned about fairness in Government as I am about fairness to the defendant. I made a mistake, and if you exploit it, it's just unfair to the defendant, and I think maybe you wouldn't want to do that.

The judge's comment about Friedman's "highly improbable story" was nevertheless widely reported in New York City.

Following the robing room session, Judge Knapp agreed in open court to give

the jury a cautionary instruction based upon a proposal Puccio had submitted. The jury was then brought in, and the United States Attorney resumed his cross-examination of Friedman. At the end of the morning session, Judge Knapp instructed the jury as follows:

Ladies and gentlemen, this is the time for my usual homily about newspapers and radios. It becomes pertinent now because I understand now ... the local radio may have started picking up bulletins from this trial.

... A discussion may be going on [among] three or four people for a half hour or so, and in the course of it, somebody may say something which is quoted. [A]nd anybody who had been at the conference may not even—not remember it was said, because it obviously had no meaning. But all by itself, it could sound as though it had meaning.

And this is particularly pertinent [to] any conversation that Mr. Puccio and I may have engaged in, because we get under each other's skin.

\* \* \* \* \* \*

I might have well said Point A, and then half a dozen times after said B, and whoever was listening thought A was more noteworthy, newsworthy, and so A goes out on the television or these bulletins. You can see the newspaper usually puts in qualifications, but bulletins just put in what you get.

*So if you ever hear any bulletin that anybody here, myself or anybody else, made some statement about the case, just assume that the statement was wrong. I'm not saying that you can assume that the statement wasn't made, but the statement may or may not have been. But assume that the statement didn't mean what it appears to mean in that three seconds it's allowed on a bulletin—in a three second quote.*

So I'll see you at quarter past 2:00.

(emphasis added).

After the jury had left the courtroom, the following exchange took place:

MR. PUCCIO: Judge, if I may, with respect to Your Honor's instruction, *and purely for the record,* and the last thing that Mr. Friedman desires here is a mistrial, but for the record, I think in light of the in-chambers conference, that we have to make that application. *It may be premature, but I want to protect the record.*

THE COURT: What application do you want?

MR. PUCCIO: *I said for the record, I would make an application for a mistrial.*

THE COURT: *If you want a mistrial, make a mistrial. If you don't want a mistrial, don't make an application. If the application is made, I've got to rule on it. I don't rule on things that are made for the record.*

MR. PUCCIO: *Let me think about it, Judge, and see what—*

THE COURT: All right.

(emphasis added). The court then recessed for lunch, after which the United States Attorney continued his examination of Friedman.

On the next morning, before the jury was brought in, Puccio told the district court that "my comments before lunch period yesterday were somewhat premature. I still think any kind of motion is premature." Puccio nevertheless stated that "in light of the tremendous publicity that remark got, ... I think it's incumbent upon the Court [to] spend[] a half hour to individually talk to each juror and see if anybody heard anything about this." After some discussion, Judge Knapp, the lawyers and the defendants agreed that Judge Knapp would conduct a voir dire of each juror in his robing room.

In the robing room, in the presence of only his two law clerks, a court reporter, Puccio and the United States Attorney, Judge Knapp asked each juror individually if he or she had read or heard anything about the case in the previous twenty-four hours. None of the seventeen Hartford-area jurors had read or heard of the district court's comment, and when proceedings resumed in open court, Puccio made no men-

tion of any motion for a mistrial or other relief. No mistrial motion was ever made.[9]

■■■ There can be little question that Friedman's considered decision not to seek a mistrial constitutes a waiver of any claim that he was prejudiced by Judge Knapp's comment.[10] In *United States v. Dukes*, 727 F.2d 34, 40 (2d Cir.1984), for example, we confronted an analogous situation involving an allegedly prejudicial line of questioning undertaken by a prosecutor. Although the defendant in *Dukes* did object to one of the prosecutor's questions, he neither moved for a mistrial nor sought to have the entire colloquy stricken. We held that "absent . . . a motion [for mistrial], the allegedly prejudicial conduct may be reviewed only for plain error." *Id.; see also United States v. Stirling*, 571 F.2d 708, 734 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). The fact that the conduct challenged here was that of the trial judge rather than of the prosecution does not diminish the force of this rule. *Cf., e.g., United States v. Carpenter*, 776 F.2d 1291, 1294–95 (5th Cir.1985) (trial judge's comment that "I still haven't heard [a defense]" reviewed for plain error in absence of objection); *United States v. Salazar*, 293 F.2d 442, 444 (2d Cir.1961) (trial judge's hostile questioning of defendant reviewed for plain error in absence of objection).

Relying on *United States v. Hammond*, 605 F.2d 862 (5th Cir.1979), Friedman nevertheless asserts that his claim should not be deemed waived, because Judge Knapp's comment presented him with a "Hobson's choice" between the equally unattractive options of continuing a trial with an arguably tainted jury and of facing the expense and delay of a new trial. Acceptance of this argument, however, would for the most part relieve defendants of the obligation to make mistrial motions, for "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by a prosecutorial or judicial error." *United States v. Scott*, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978) (quoting *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (Harlan, J.) (plurality opinion)). Friedman thus asks for a rule under which a wise defendant would almost always (except in those few cases where reprosecution after a mistrial would be barred) forego a mistrial motion, safe in the knowledge that, after a verdict of guilty, he or she could safely point to the potential expense and delay of a new trial and argue that he or she was now entitled to suffer that expense and delay. We decline to adopt such a rule.

Friedman's reliance on *Hammond*, moreover, is misplaced. In *Hammond*, the government had intimidated the defendant's witnesses. Instead of moving for a mistrial, however, defense counsel agreed to stipulate to the testimony of the intimidated witnesses. On appeal, the Fifth Circuit held that the defendant's due process claim was not waived under the "extraordinary circumstances" presented because "the alternatives posed . . . amounted to a Hobson's choice: either there would be a mistrial, after which a new trial would present the same problems as the present trial, or the trial would proceed on the basis of the stipulation." 605 F.2d at 863. In contrast, the instant case involves no such Hobson's choice, for any prejudice that might have resulted from the district court's comment could have been completely cured by a new trial. Accordingly, we review Friedman's claim only for plain error.

**9.** Friedman now asserts that his claim regarding Judge Knapp's comment is not waived because his counsel did in fact "move for a mistrial," albeit "for the record." Even if that tentative request is to be treated as a formal "motion" for a mistrial, the "motion" was withdrawn when counsel asked the court for time "to think about it" and when he later told the court that "any kind of motion is premature."

**10.** In this regard, we reject Friedman's request that we vacate Judge Knapp's order prohibiting counsel from interviewing the jurors after the trial. If there was an appropriate time to conduct a second interview of the jury to determine whether they had been exposed to Judge Knapp's comment, that time certainly had expired when the jury began its deliberations.

■ There was no reversible error, much less plain error. Judge Knapp's comment was made outside the presence of the jury, and the jury never learned of it. *Cf., e.g., United States v. Giraldo,* 822 F.2d 205, 209 (2d Cir.) (no impact on jury where allegedly biased behavior of court took place outside presence of jury), *cert. denied,* —— U.S. ——, 108 S.Ct. 466, 98 L.Ed. 2d 405 (1987); *United States v. Pisani,* 773 F.2d 397, 403–04 (2d Cir.1985) (same). Moreover, Friedman's claim that there is "no adequate assurance" that the jury was not exposed to the court's remark is directly contradicted by the very record that he urged the district court to make and that led him to drop any request for a mistrial. *See, e.g., United States v. Canniff,* 521 F.2d 565, 572 (2d Cir.1975) (failure to object to prosecutor's remark not only constitutes waiver but "indicates counsel's own difficulty in finding any prejudice"), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed. 2d 650 (1976).

### G. *The Effect of the Dismissal of the Mail Fraud Counts*

The government concedes that the mail fraud charges in the instant case must be dismissed in light of the Supreme Court's decision in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We therefore vacate appellants' mail fraud convictions.

In addition, Shafran contends that his RICO conviction must be reversed because of the supposedly inflammatory nature of the now-dismissed mail fraud charges. The indictment charged that the defendants

> unlawfully, wilfully and knowingly did devise and intend to devise a scheme and artifice to defraud the City, the DOT, the PVB[,] [the City Taxi and Limousine Commmission, the City Department of General Services] and the citizens of the City of their right to the honest and loyal services of [Donald Manes and Geoffrey Lindenauer, and/or Lester Shafran] and of the right to have the business and affairs of the City, the DOT[,] [and] the PVB[,] [the City Taxi and Limousine Commission and the City Department of

General Services] conducted honestly and free from fraud, corruption, and the illegal receipt of bribes.

Indictment ¶¶ 49, 53, 57, 62, 72; *see also id.* ¶ 40. In turn, the jury was asked

> as to each of the mail fraud counts ... to ascertain whether or not the Government has proven beyond a reasonable doubt that the particular defendant whose case you are considering knowingly and willfully participated in a fraudulent scheme to deprive the City of New York of the honest services of one of its employees through bribery.

Under *McNally,* of course, the "intangible rights" theory does not allege a violation of the mail fraud statute.

■ We cannot agree that Shafran's RICO convictions must be reversed because of the inflammatory impact of the government's mail fraud theory. As we stated in *United States v. Ivic,* 700 F.2d 51, 65 (2d Cir.1983), "[i]nvalidation of the convictions under [one] [c]ount ... does not, of course, lead automatically to reversal of the convictions on the other counts." Rather, we must "consider whether the presence of the [invalidated] count had any spillover effect sufficiently prejudicial to call for reversal." *Id.* We see no prejudice here.

The RICO charges in this case were the core of the indictment, and the core of the RICO charges were state-law bribery allegations. Specifically, the first twenty-nine pages of the forty-one-page indictment were devoted to the two racketeering counts. Of the twenty-five racketeering acts alleged, and the twenty-two that went to the jury, only one, a mail fraud allegation against Friedman involving bribery, did not charge an act of bribery as defined under New York law. The seven mail fraud counts, moreover, paralleled the RICO predicate acts both factually, *see supra* Background Part A, and legally, *see, e.g., United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Accordingly, "[t]he elimination of the [mail fraud] count[s] would not have

significantly altered the trial strategy of the defense," *Ivic*, 700 F.2d at 65, if at all.

■■■ Indeed, the likelihood of prejudice in the instant case is even less than that found to be insufficient in *Ivic*, a case in which we reversed the appellants' RICO conspiracy convictions but affirmed as to the remaining counts. In *Ivic*, the predicate acts charged in the RICO conspiracy count, murder and arson, were factually and legally distinct from much of the rest of the indictment. Moreover, we expressed our concern about the "decidedly perjorative connotation," *id.*, that may occur "when the Government . . . tar[s] a defendant with the label of 'racketeer.'" *Id.* (quoting *United States v. Guiliano*, 644 F.2d 85, 89 (2d Cir.1981)). In contrast, the "intangible rights" theory is hardly "inflammatory." It is fanciful to think that the indictment's boilerplate accusation that Shafran had deprived the City of New York of the "honest and loyal" services of persons such as Lindenauer, Manes and himself could have caused the jury to take leave of reason, particularly in the presence of the numerous valid bribery and racketeering charges. We note in this regard Shafran's acquittal on the mail fraud count concerning the alleged Candler Building bribe. *Cf. id.* (noting jury's "discriminating acquittal on Count 4"). In sum, Shafran suffered no prejudice as a result of the invalid mail fraud counts.[11]

### H. *Preindictment Publicity*

■■■ Finally, we address contentions concerning the extensive publicity that surrounded this case during the grand jury investigation. Appellants and amicus contend that much of this publicity, which Judge Knapp described as "outrageous," was instigated by the government. In addressing this issue, we will assume *arguendo* that the government persistently leaked information about grand jury proceedings to the press in an unethical and unlawful campaign both to induce the cooperation of potential witnesses and to supplant state prosecutorial efforts in a bureaucratic turf fight. For reasons stated immediately *infra*, we believe that this claim is precluded by pertinent Supreme Court precedent, no matter how pervasively the rules concerning grand jury secrecy were violated.

Appellants rely in particular upon Fed.R. Crim.P. 6(e)(2), which provides that "an attorney for the government . . . shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules," and upon Rule 7 of the Criminal Rules of the United States District Courts for the Southern and Eastern Districts of New York, which provides that

> [w]ith respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance

---

**11.** In his reply brief, Friedman presents two arguments as to why reversal of his mail fraud convictions requires reversal of his RICO convictions. The first is similar to Shafran's contention above, but emphasizes the fact that "Friedman was the *only* defendant whose alleged participation in an improper mail fraud count was also charged as a predicate act for RICO." We fail to see, however, for reasons stated in the text, how one bribery-related mail fraud predicate act out of the twenty-five charged makes Friedman's contention any more compelling than Shafran's.

Friedman's second argument is that the RICO convictions in this case must be reversed because "[w]ithout the mail fraud counts, this case involved *only* state bribery charges which were leveraged into federal court through the vehicle of RICO." Accordingly, argues Friedman, "under *McNally* there is no valid basis for the exercise of federal jurisdiction." This contention is frivolous. A RICO state-law predicate act is not merely some criminal-law analogue of the pendent state-law civil claim. Rather, racketeering as defined under RICO is itself a federal offense, and RICO's "references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute." *United States v. Bagaric*, 706 F.2d 42, 62–63 (2d Cir.) (quoting *United States v. Salinas*, 564 F.2d 688, 690 (5th Cir.1977), *cert. denied*, 435 U.S. 951 (1978)), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983).

in the apprehension of a suspect, to warn the public of any dangers or otherwise to aid in the investigation.

Assuming that the government willfully and repeatedly violated these rules, we must nevertheless affirm in light of *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). In that case, the Supreme Court rejected a contention that government misconduct during grand jury proceedings required reversal of a defendant's conviction in the absence of any effect on the outcome of his trial. *Mechanik* involved alleged violations of Fed.R.Crim. P. 6(d), and the Court

> assume[d] for the sake of argument that the simultaneous presence and testimony of ... two Government witnesses before the grand jury violated Rule 6(d), and that the District Court would have been justified in dismissing portions of the indictment on that basis had there been actual prejudice and the matter been called to its attention before the commencement of the trial.

*Id.* at 69–70, 106 S.Ct. at 941. Nevertheless, the Court held that "the supervening jury verdict made reversal of the conviction and dismissal of the indictment inappropriate." *Id.* at 70, 106 S.Ct. at 941. The Court reasoned that the "petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." *Id.* The Court concluded that "[m]easured by the petit jury's verdict ... any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.*

Amicus curiae seeks to distinguish *Mechanik* because of the Court's statement that it "express[ed] no opinion as to what remedy may be appropriate for a violation of Rule 6(d) that has affected the grand jury's charging decision and is brought to the attention of the trial court before the commencement of trial." *Id.* at 72, 106 S.Ct. at 943. According to amicus, *Mechanik* does not govern here because the government's misconduct was brought to

Judge Knapp's attention before trial. This argument, however, ignores the underlying justification given in *Mechanik*. Specifically, the Court stated:

> The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences.... *These societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.*

*Id.* at 72, 106 S.Ct. at 942–43 (emphasis added). Once the district court denies, as Judge Knapp did, a motion to dismiss an indictment based on a violation of Rule 6(e), and the trial thereafter takes place, the "balance of interest" is precisely that faced by the Court in *Mechanik*.

■■ Nevertheless, this case stands on a somewhat different footing than *Mechanik*, for the quite simple reason that this case involves a violation of Rule 6(e) as opposed to a violation of Rule 6(d). A betrayal of grand jury secrecy, unlike misconduct or error confined to the grand jury room, jeopardizes the defendant's right to a fair trial before a petit jury. We recognized this distinction recently in *United States v. Midland Asphalt Corp.*, 840 F.2d 1040, 1045–46 (2d Cir.1988), where we held that an order denying a motion to dismiss an indictment was not appealable under the collateral-order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). We reached this conclusion because *Mechanik* by its terms does not bar reversal of a conviction when misconduct before the grand jury "has deprived [the] defendant of a fair determination of the issue of guilt or innocence." *Mechanik*, 475 U.S. at 72, 106 S.Ct. at 943; *see Midland Asphalt*, 840 F.2d at 1046.

**584**

However, appellants simply cannot show resultant prejudice from the publicity surrounding the grand jury proceedings and make no claim that the Connecticut petit jury was affected by the government's misconduct. Rather, they assert only that the "illicit publicity about impermissible facts is safely to be supposed, and could undoubtedly have been shown, to have infected the grand jury." In view of the limited nature of appellants' claim, we have little doubt that the change of venue, and the use of a Hartford jury pool, along with voir dire, removed any possibility of prejudice at trial. Under *Mechanik,* therefore, the government's conduct does not now afford appellants a basis upon which to claim error.

### CONCLUSION

We have examined appellants' other contentions and have found them to be without merit. Accordingly, for the foregoing reasons, we affirm the convictions of Friedman, Lazar and Shafran on the RICO counts, Counts One and Two, along with Kaplan's conviction on Count Seven for perjury. We reserve decision on Kaplan's convictions on Counts One and Two. We vacate the convictions of all appellants on the mail fraud counts, Counts Three, Four, Six, Eight and Nine.